ATHENE LAW, LLP
Long X. Do (Cal. 211439)
E-mail: long@athenelaw.com
5432 Geary Boulevard, #200
San Francisco, California 94121
Telephone: (415) 680-7419

BELL, MCANDREWS & HILTACHK, LLP
Thomas W. Hiltachk (Cal. 131215)
E-mail: tomh@bmhlaw.com
455 Capitol Mall, Suite 600
Sacramento, California 95814
Telephone: (916) 442-7757

*Attorneys for Plaintiffs California Primary Care
Ass'n and Open Door Community Health Ctrs.*

POWERS PYLES SUTTER & VERVILLE PC
Rosie Dawn Griffin (DC 1035462)*
E-mail: rosie.griffin@powerslaw.com
1250 Connecticut Ave, NW, 8th floor
Washington, DC 20036
Telephone: (202) 466-6550

*Application for admission pro hac vice forthcoming*

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF CALIFORNIA
### SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA PRIMARY CARE ASSOCIATION; OPEN DOOR COMMUNITY HEALTH CENTERS, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SHIRLEY N. WEBER, PH.D., in her official capacity as California Secretary of State; SERVICE EMPLOYEES INTERNATIONAL UNION – UNITED HEALTHCARE WORKERS WEST, as a real-party-in-interest proponent of California Ballot Initiative 25-00008; SHAWNA BROWN, in her capacity as the official proponent of California Ballot Initiative No. 25-00008; and SEAN FLEMING, in his capacity as the official proponent of California Ballot Initiative No. 25-00008, <br><br> *Defendants*. | Case No.:   3:26-cv-03837 <br><br> **COMPLAINT** |

COMPLAINT FOR DECL. AND INJ. RELIEF

Plaintiffs, California Primary Care Association ("CPCA") and Open Door Community Health Centers ("Open Door"), by and through their undersigned counsel, for themselves individually and CPCA additionally as associational representative of its federally-funded community health center members, bring this civil action for declaratory and injunctive relief, and allege as follows:

I

**<u>PRELIMINARY STATEMENT</u>**

1.    Borne out of President Lyndon B. Johnson's War on Poverty and the Civil Rights Movement, community health centers ("CHC") have for decades utilized federal resources to provide affordable, high-quality comprehensive primary and preventive health care services to millions of patients in underserved communities throughout California. CHCs are the number one provider of health care to California's Medi-Cal population, operating in all corners of the state to bridge gaps between healthy communities and access to vital health care.

2.    Plaintiff Open Door exemplifies the indispensable role CHCs play. For over half a century, Open Door has been a pillar in the rural northern California community. Founded by local leaders and physician volunteers, Open Door consistently introduces and cultivates innovative programs to effectively lower barriers and increase health care access across Humboldt, Del Norte, and Trinity Counties. Programs such as Open Door's Nurse Practitioner and Family Medicine training residency programs, mobile health services, patient navigation services, and a telehealth-focused health center have proven to be highly beneficial to rural communities, where specialty care can be limited. Today, Open Door operates 13 federally-funded clinics serving over 60,000 patients annually, accounting for more than 40 percent of the area population. There are only two other small CHCs serving the nearly 8,500 square mile tri-county area of coastal northern California. The health and well-being of California's residents over this large stretch of rural communities would be put in jeopardy without Open Door.

3.    CHCs throughout California similarly receive federal funding to serve as lifelines in their communities. CHCs serve one of every four Medi-Cal enrollees, which is approximately one in six Californians. These are some of the most medically underserved groups, including

2

COMPLAINT FOR DECL. AND INJ. RELIEF

those experiencing poverty or homelessness, agricultural/migrant workers, and racial minorities. Operating on thin margins, every dollar in revenue matters to CHC operations.

4.    CPCA brings this action on behalf of its CHC members throughout the State, to preserve and protect CHCs' ability to continue to deliver the level and quality of health care services to Californians in compliance with federal law. The action is necessary to protect against an unprecedented threat of state obstruction with federal objectives and interference with CHCs' federally-approved projects and budgets.

5.    Plaintiffs seek to prevent a proposed statewide initiative—misleadingly named the "Clinic Funding Accountability and Transparency Act" (the "Initiative")—from being placed on California's November 3, 2026, General Election ballot and any ballot thereafter, because the Initiative would create an exclusively state-operated auditing and penalty scheme preempted by federal law. The Initiative's scheme is centered around an ill-informed and unrealistic ninety percent "spend ratio" requirement dictating how CHCs can spend federally-appropriated funds and any other revenues, including "non-grant" income over which the federal government exercises statutory and regulatory control.

6.    The vast majority of California CHCs (more than 90 percent) will be penalized under this unlawful scheme. In the first year of operation alone, the Initiative would siphon $1.7 billion of CHC revenue into the State coffers without likelihood of the money ever being returned to serve CHC patients. The immediate loss of such revenue would force the vast majority of CHCs to fall into negative margin operations, likely forcing many to contract services, lay off staff, and/or shut down. CHCs forced to operate in the red under the Initiative collectively provide 15.5 million patient encounters annually. The displacement of CHC patients will have negative ripple effects on the State's health care system as patients seek health care services elsewhere, driving up health care expenditures and disrupting patient access to services. The Initiative will directly threaten the well-being and safety of millions of Californians, depriving them of access to CHCs like Open Door that have been embedded in their communities for many decades.

7.    The Initiative is not only bad public policy but it also seeks to enact a state law that is plainly beyond the power of the people of California to enact through the state ballot

COMPLAINT FOR DECL. AND INJ. RELIEF

initiative process because it is preempted by federal law. CHCs are not only federally funded, but also operate in strict compliance with their governing statute, 42 U.S.C. § 254b, and hand-in-hand with the federal government, today the U.S. Department of Health and Human Services ("HHS") and its Health Resources and Services Administration ("HRSA"). Approximately eighty-three percent of California CHC revenue comes from federally regulated funding sources, including Medicaid, Medicare, and federal grants.

8.      Further, by redirecting CHC grants and reimbursements earned by CHCs for services rendered to Medi-Cal beneficiaries into state coffers for other uses, the Initiative's penalty provisions operate as an impermissible tax on federally qualified entities and authorize the State to claw back Medicaid reimbursements to which CHCs have a federal statutory right.

9.      The declaratory and injunctive relief sought against the Secretary of State is needed now. As the California Supreme Court has made clear, a pre-election challenge, such as this, to prevent an initiative from being placed on the State ballot is appropriate and warranted when the initiative is plainly unconstitutional or unlawful, or where the initiative would enact a law that is beyond the power of the citizens of California to enact. *See, e.g.*, *American Federation of Labor v. Eu*, 36 Cal. 3d 687, 695-696 (1984). The mere presence of the Initiative on the ballot causes all CHCs throughout California, including Plaintiffs and CPCA's CHC members, harm. If the unlawful Initiative is allowed to proceed to the ballot, as it likely will given the number of signatures that have been submitted, Plaintiffs will be compelled to spend tens of millions of dollars trying to convince voters to reject the Initiative. Worse yet, Plaintiffs and CPCA's members will be compelled to take costly immediate action in anticipation of the Initiative's passage, to attempt to avoid financially devastating consequences with serious downstream effects on public health due to reduced or eliminated health care services. Open Door has suffered detriment since the announcement of the Initiative and will continue to suffer harm.

COMPLAINT FOR DECL. AND INJ. RELIEF

## II

## JURISDICTION AND VENUE

10.     The Court has jurisdiction over this action under 28 U.S.C. §§ 1331, 1343, and 1349.

11.     Venue is proper in this jurisdiction under 28 U.S.C. § 1391(b) because a substantial part of the events or actions that are the subject of the claims in this action occurred or will occur or has been or will be felt in this district, where one or more plaintiff resides or operates.

12.     Venue is proper in the San Francisco Division of this Court pursuant to Civil Local Rule 3-2(c) and the Court's Assignment Plan (General Order No. 44). CPCA's CHC members operate throughout this district, and the current and future impact of the Initiative will be felt throughout the district.

13.     The Court has the authority to provide the relief requested under the Supremacy Clause, U.S. Const. art. VI, cl. 2, as well as 28 U.S.C. §§ 1651, 2201, and 2202, and its inherent equitable powers.

14.     The Court has authority to issue declaratory relief as requested herein pursuant to 28 U.S.C. section 2201 and 2202 and Federal Rules of Civil Procedure ("FRCP"), rule 57.

15.     The Court has power to issue injunctive relief as requested herein pursuant to FRCP, rule 65.

16.     An actual controversy exists between the parties concerning the constitutionality and validity of the Initiative. A declaration that the Initiative is invalid and an injunction against its enforcement would resolve the controversy.

## III

## PARTIES

A.     **Plaintiff California Primary Care Association**

17.     CPCA brings this action on behalf of itself and its members. Formed in 1994, CPCA is the statewide leader and a prominent voice in representing and serving California

5

community health centers to preserve and enhance their ability to serve the residents of their communities. CPCA's members include 2,300 nonprofit community health center and clinic sites throughout California that provide comprehensive primary and preventive health services to low-income and uninsured patients. CPCA's members include community and free health centers, federally funded and federally designated health centers, rural and urban clinics, large and small clinic corporations, and clinics dedicated to special needs and special populations. CPCA also works closely on policy and program issues with Regional Associations of California ("RAC"), the coalition of regional clinic networks that represent CHCs at the local level and provide a regional clinic voice.

18.    CPCA's mission is to help California CHCs fulfill their mission of overcoming barriers to healthcare access such as poverty, lack of health insurance, ethnicity, language and culture, disability, homelessness, geographic isolation, and other needs. These barriers continue to exist despite recent expansions in publicly supported health insurance programs for uninsured populations. Working alongside its RAC partners, CHCs, and other stakeholders, CPCA actively addresses these barriers through programs tailored to empower health clinics offering culturally appropriate, high-quality primary and preventive health services. In this regard, CPCA regularly educates, advocates for, and assists CHCs in meeting their federal and state regulatory compliance obligations.

19.    CPCA brings this suit on its own behalf with organizational standing. CPCA has been, is being, and will be directly and adversely affected by the actions described in this Complaint. The state ballot initiative and related actions described herein have and, unless relief is granted, will continue to force CPCA to divert substantial money, time, and resources away from its mission work. If the Initiative is placed on the ballot, CPCA will have to divert additional time, resources, and money towards education, advocacy, voter engagement and campaigning, analysis, and other activities that divert resources and attention better spent in advancing—rather than defending—CPCA's mission. If the Initiative were to pass and take effect, CPCA will have to divert additional time, resources, and money to assist its members to understand and respond to the requirements in the Initiative.

COMPLAINT FOR DECL. AND INJ. RELIEF

20.     CPCA also brings this suit with associational standing on behalf of its CHC members, who would have standing in their own right to bring this action, because they have been, are being, and will be directly and adversely affected by the conduct described in this Complaint. Due to the risks, costs, and burdens of litigating this action, CPCA members cannot financially or practically afford to individually litigate the claims asserted herein and instead have authorized CPCA to represent them in this action. The relief that is requested herein—enjoining Defendant Shirley N. Weber, PhD, in her official capacity as California Secretary of State, and her office from placing a constitutionally invalid state initiative on the November 2026 ballot— would not require the involvement or participation of CPCA's individual members.

**B.      Plaintiff Open Door Community Health Centers**

21.     Plaintiff Open Door is a CPCA CHC member, federally qualified health center ("FQHC"), and Health Care for the Homeless grantee. Founded by local physicians and community members in 1971, Open Door has adopted a broad-egalitarian purpose to "promote[] social justice and human dignity through exceptional patient-centered care that improves the health and well-being of our patients, community, and staff." To carry out its services, Open Door employs approximately 800 community members and operates 13 community health centers that include telehealth services and a pharmacy located throughout Humboldt and Del Norte counties. Open Door serves the residents of these counties and the surrounding counties of rural Northern California by the provision of primary care medical services, comprehensive dental care, behavioral and mental health care, patient education, and pregnancy services.

22.     Open Door has been, is being, and will be directly and adversely affected by the actions described in this Complaint. It has diverted money and human resources to analyze the Initiative; educate staff, patients, or other stakeholders; consider and modify capital expenditure and other spending plans; consider and modify fundraising goals and plans; and consider and modify proposals and applications for federal grants and other nonfederal revenues. Open Door also has contributed money to support the campaign against the Initiative.

COMPLAINT FOR DECL. AND INJ. RELIEF

## C.    Defendant Shirley N. Weber, Ph.D.

23.    Defendant Shirley N. Weber, Ph.D. ("Weber" or "Defendant") is the California Secretary of State. She is sued in her official capacity.

24.    As the Secretary of State, Weber has a statutory, non-discretionary duty to administer the provisions of the California Elections Code, to see that elections are efficiently conducted and to ensure that state election laws are enforced. *See* Cal. Gov. Code § 12172.5. Weber, or her designee, must also issue a "certificate of qualification" on the 131st day prior to the November General Election (November 3, 2026) if the petition has been certified to have been signed by the requisite number of qualified voters pursuant to California Elections Code section 9033. Thereafter, she, or her designee, must commence preparation and printing of the State Voter Information Guide. *See* Cal. Elec. Code §§ 9080, *et. seq.* Plaintiffs believe, and on that basis allege, that Defendant Weber will commence to print the State Voter Information Guide on or about August 10, 2026. Thereafter, the various county election officials will commence the process of printing ballots for the November 3, 2026, General Election.

## D.    Real Parties in Interest

25.    Real-party-in-interest Service Employees International Union – United Healthcare Workers West ("UHW") is a union headquartered in Oakland, California. UHW is a real-party-in-interest behind the Initiative. The Initiative's two official proponents are UHW employees, and UHW has spent approximately $8 million to gather enough signatures to qualify the Initiative for the ballot. UHW has organized a campaign, including protests at CHCs that disrupt operations and threaten CHC staff, to push the Initiative through the election, and UHW has committed millions of dollars more to campaign, market, and push PR in favor of the Initiative. No other group or individual has engaged in the level of campaigning and financial backing of the Initiative greater than UHW. UHW also has and is using the presence of the Initiative on the ballot as a negotiating tool to force CPCA to concede to the union's demands for increasing UHW membership in CHCs.

COMPLAINT FOR DECL. AND INJ. RELIEF

26.     Real-parties-in-interest Shawna Brown and Sean Fleming are employees of UHW. Having filed the Initiative and officially recognized as its proponents, they are real-parties-in-interest behind the Initiative.

## IV

## COMMUNITY HEALTH CENTERS AND GOVERNING FEDERAL LAW

**A.     CHCs Are Dedicated to Serving the Neediest Communities.**

27.     CHCs are the primary source of care for California's most vulnerable patients, as they are required by federal law to provide primary care and related services to all individuals that come through their doors, regardless of any individual's ability to pay, insurance status, or individual circumstances. *See* 42 U.S.C. § 254b(a)(1).

28.     California CHCs served 6.2 million people in 2025, or approximately 1 in 6 Californians. Approximately 67% of these patients are Latino, Asian Pacific Islander, or Black. Sixty-seven percent (4.2 million) are enrolled in Medi-Cal, California's Medicaid program. That means 1 in 4 Medi-Cal enrollees were served by CHCs. More than half of California CHC patients are at or below the federal poverty level. Nearly 300,000 California CHC patients in 2025 experienced homelessness; and more than half a million were agricultural/migrant workers. In short, CHCs serve California's most vulnerable patients.

29.     CPCA's CHC members are, by law, community-based, patient-directed nonprofit organizations that receive, or are eligible to receive, federal financial assistance—*i.e.*, federal grant funding—under Section 330 of the Public Health Service (PHS) Act , *codified at* 42 U.S.C. § 254b. More than eighty-percent of California CHCs' revenue is derived from federal and federally-regulated funding sources.

**B.     Congress Has Long Authorized Significant Federal Funding to CHCs to Create a Federally-Supported Health Care Safey-Net and Improve Public Health.**

30.     The U.S. Constitution's Spending Clause empowers Congress to expend federal funds for public purposes that promote the general welfare, U.S. Const. art. I, § 8, cl. 1. Congress has exercised its Spending Clause authority to make laws to improve public health, including

COMPLAINT FOR DECL. AND INJ. RELIEF

laws providing for the provision of preventive and primary care services to medically underserved and vulnerable patients, at federal taxpayer expense, *e.g.*, 42 U.S.C. § 254b.

31.    Congress has authorized the Executive Branch—now through the HHS Secretary—to provide federal grant funding to CHCs, through both annual discretionary appropriations and, since 2010, through mandatory Community Health Center Fund appropriations. *See* 42 U.S.C. § 254b(c)–(e) (providing for health center planning grants, supplemental grants, and operational grants); 42 U.S.C. § 254b-2 (providing for CHCF funding).

32.    Congress established the first federally-funded neighborhood health centers—as a demonstration project precursor to today's CHCs—via the Economic Opportunity Act of 1964, a cornerstone of President Lyndon B. Johnson's "War on Poverty." Pub. L. No. 88-452, §§ 201–212, 78 Stat. 508 (1964) (establishing grants for nonprofits to develop "community action programs" for the advancement of public health and welfare). Federal financial assistance provided under this Act was directed at communities with high incidences of poverty, considering, *inter alia*, "the concentration of low-income families. . . the extent of persistent unemployment and underemployment . . . the incidence of disease, disability, and infant mortality; housing conditions; [and the] adequacy of community facilities and services." *Id.* at § 205(c). Neighborhood health centers pioneered a novel use of federal funds to directly deliver primary care to underserved populations.

33.    The Comprehensive Health Planning and Public Health Service Amendments of 1966, Pub. L. No. 89-748, 80 Stat. 1180 (1966), passed two years later, provided additional federal appropriations to the Executive Branch to direct to nonprofits to meet the needs of underserved populations, including through the provision of comprehensive ambulatory health services. *Id.* § 3; *see also* S. Rep. No. 94-29, at 115–16 (1977).

34.    In 1970, Congress again exercised its Spending Clause authority to deploy direct federal resources to underserved communities, amending the PHS Act to "authorize the assignment of commissioned officers of the Public Health Service to areas with critical medical manpower shortages . . . [and] encourage health personnel to practice in areas where shortages of such personnel exist . . . ." Pub. L. No. 91-623, 84 Stat. 1870 (1970). Also via that amendment,

COMPLAINT FOR DECL. AND INJ. RELIEF

Congress mandated that it "be the function of an identifiable administrative unit within the Service to improve the delivery of health services to persons living in communities or areas of the United States where health personnel and services are inadequate to meet the health needs of the residents of such communities and areas." *Id.* at § 329(a).

35.    Five years later, in 1975, Congress enacted Section 330 of the PHS Act, outsourcing PHS functions through the creation of a permanent community health center program. Pub. L. No. 94-63, § 330, 89 Stat. 304, 343 (1975), *codified at* 42 U.S.C. § 254b.

36.    Section 330 delegates authority to the HHS Secretary to execute Section 330 by making grants "for the costs of the operation of public and nonprofit private health centers that provide health services to medically underserved populations," 42 U.S.C. § 254b(c), (e)(1)(A), 42 C.F.R. § 51c.301, as well as for other planning and development costs, including "the costs of acquiring and leasing buildings and equipment . . . and the costs of providing training related to the provision of required primary health services and additional health services." 42 U.S.C. § 254b(e)(2); *see also* 42 C.F.R. § 51c.107.

37.    Congress envisioned that the HHS Secretary would prioritize the award of such grants to areas with the greatest need, S. Rep. No. 94-29, at 122 (1975), and directed that funds be awarded to CHCs to provide primary health care and related services to areas and/or populations HHS has designated as medically underserved. 42 U.S.C. § 254b(a), (b)(3), (e), (k); 42 C.F.R. § 51c.201; 42 C.F.R. § 51c.102(e).

38.    In its consideration of Section 330, Congress emphasized that federal direction was needed regarding "the way [health] centers should be organized and administered . . . to bring [health centers] up to a set of standards and services reflecting [Congress's] intent. S. Rep. No. 94-29, at 39 (1975).

39.    Congress thus structured the health center program as a grantor-grantee relationship, making each CHC "in effect an agent to carry out specified tasks" of the PHS at the HHS Secretary's direction and under significant federal oversight and control. *See In re Joliet-Will Cnty. Cmty. Action Agency*, 847 F.2d 430, 432 (7th Cir. 1988).

40.    In 2010, through the Patient Protection and Affordable Care Act ("ACA"), Congress permanently authorized the health center program, eliminating the need for periodic reauthorization. Pub. L. No. 111-148, §§ 5502, 5602, 124 Stat. 119, 654–55, 677–78 (2010). The ACA provided sustained investment in CHCs through a newly established Community Health Center Fund ("CHCF"), from which the HHS Secretary is authorized to distribute funds to expand and strengthen the community health center model. § 10503, 124 Stat. at 1004.

41.    Section 330 funding is thus derived through two federal funding streams: (1) an annual, discretionary appropriation, and (2) the CHCF, which supplements annual appropriation amounts with multi-year funding. *See* 42 U.S.C. § 254b(c)-(e) (providing for health center planning grants, supplemental grants, and operational grants); 42 U.S.C. § 254b-2 (providing for CHCF funding); *see also* Consolidated Appropriations Act of 2024, Pub. L. No. 118-42, § 101, 138 Stat. 25, 397 (2024) (reauthorizing CHCF by amending 42 U.S.C. § 254b-2(b)(1)(F)).

42.    Congress delegated to HHS discretion to determine whether to pay CHC operating grants in advance or via reimbursement, as well as to determine the number of installments through which the funds are dispersed, and whether adjustments are necessary for overpayments or underpayments. 42 U.S.C. § 254b(e)(5)(C); 42 C.F.R. § 51c.108.

43.    The amount of Section 330 operational funding disbursed to any individual CHC may not exceed the amount by which the costs of its operation exceed the total of its "nongrant funds," *i.e.*, all "State, local, and other operational funding provided to the center" and "fees, premiums, and third-party reimbursement," a CHC reasonably expects to receive for its operations in a given fiscal year. *Id.* § 254b(e)(5)(A), (D), (k)(3)(N); *see also* 42 C.F.R. § 51c.106(a)(2)(i)(A) (amount of federal grant determined in part by CHC's "ability . . . to finance its share of project costs from non-Federal sources").

**C.    CHCs Operate under a Comprehensive Federal Statutory and Regulatory Scheme.**

44.    In providing medical care to underserved areas and populations, CHCs must work "hand-in-hand with the federal government to achieve a task that furthers an end of the federal government." *Agyin v. Razmzan*, 986 F.3d 168, 177, 78 (2d Cir. 2021) (concluding health center physician "was 'acting under' a federal officer because he performed work that, absent the

COMPLAINT FOR DECL. AND INJ. RELIEF

program in which he participated, the government would have had to perform itself; his work assisted the mission of the federal agency that oversaw his work; and he was subject to federal oversight and control.").

45.    To apply for Section 330 funding, CHCs must provide the Secretary with: a "description of the unmet need for health services in the catchment area of the center;" a "demonstration . . . that the area or population group to be served . . . has a shortage of personal health services;" and a "demonstration that the center will be located so that it will provide services to the greatest number of individuals . . . ." 42 U.S.C. § 254b(k)(2).

46.    To maintain federal status and Section 330 funding, federal law mandates that CHCs must, *inter alia*:

a.    Provide "required primary health services," to "all residents" of its federally-designated service area, regardless of patient insurance status or ability to pay for care and in a manner that ensures care continuity, 42 U.S.C. § 254b(a), (b)(1) (enumerating required primary health services); 42 C.F.R. §§ 52c.102(c), 51c.303(v)(3). Such services are defined by statute as: services related to family medicine, internal medicine, pediatrics, obstetrics, or gynecology; diagnostic laboratory and radiologic services; preventive health services including prenatal and perinatal services, appropriate cancer screening, well-child services, immunizations, certain screenings, family planning services, and preventive dental services; emergency medical services; and pharmaceutical services where appropriate. 42 U.S.C. § 254b(b)(1)(A); 42 C.F.R. § 51c.102(h).

b.    Provide their patients with: referrals to other medical providers, including for specialty care, substance use disorder treatment, and mental health services; patient case management services including counseling and follow-up services; assistance to health center patients in establishing eligibility for, and gaining access to, Federal, State, and local programs that provide or financially support the provision of, *inter alia*, medical, social, housing, and educational services; enabling services including outreach, transportation, and interpretation; education regarding the availability and proper use of health services. 42 U.S.C. § 254b(b)(1)(A)(ii).

COMPLAINT FOR DECL. AND INJ. RELIEF

c.       Discount such services on a sliding scale based on patients' household income. 42 U.S.C. § 254b(k)(3)(G); 42 C.F.R. § 51c.107(b)(5).

d.       Participate in the Medicare, Medicaid, and State Children's Health Insurance Programs ("CHIP"). 42 U.S.C. § 254b(k)(3)(E), (F).

e.       Operate under a community-based governing Board of Directors, a majority of whom must be the health center's patients "who, as a group, represent the individuals being served by the center . . ." and who must, among other responsibilities, approve the health center's annual budget. 42 U.S.C. § 254b(k)(3)(H)(i); 42 C.F.R. § 51c.304.

f.       Develop "an overall plan and budget that meets the requirements of the Secretary" and maintain an "effective procedure for compiling and reporting to the Secretary" information including "the costs of its operations." 42 U.S.C. § 254b(k)(3)(I); 42 C.F.R. § 51c.104.

g.       "Establish and maintain collaborative relationships with other health care providers . . . to provide access to services not available through the health center and to reduce the non-urgent use of hospital emergency departments." 42 U.S.C. § 254b(k)(3)(B).

h.       Employ an "ongoing quality improvement system that includes clinical services and management, and that maintains the confidentiality of patient records." 42 U.S.C. § 254b(k)(3)(C); 42 C.F.R. § 51c.303(c).

i.       Develop, and regularly submit for HHS approval, an annual "total" budget that identifies projected costs within the scope of the CHC's federal project, identifies costs to be supported by federal funds, includes all other non-Federal revenue sources that will support the project (e.g., state, local, and other operational funding; and fees, premiums, and third-party reimbursements the health center reasonably expects to receive through the operation of its federal project). 42 U.S.C. § 254b(e)(5)(A), (k)(3)(I)(i).

j.       Demonstrate financial responsibility through "the use of . . . accounting procedures and other requirements . . . prescribed by the Secretary." 42 U.S.C. § 254b(k)(3)(D); 42 C.F.R. § 51c.112; *see* 2 C.F.R. § 200.400(d) (requiring "accounting practices . . . consistent

with these cost principles . . . including maintaining adequate documentation to support costs charged to the Federal award").

k.       Annually "provide for an independent annual financial audit of any books, accounts, financial records, files, and other papers and property which relate to the disposition or use of the funds received under the grant and such other funds received by or allocated to the project for which [the] grant was made." 42 U.S.C. § 256b(q)(1); 42 C.F.R. § 51c.303(d). This requirement covers not only appropriated funds but also a CHC's "program income," obtained through, *e.g.*, Medicaid, Medicare, and private insurance reimbursements, as well as any other sources of fundings, e.g., state and local grants, charitable giving, fees for services.

l.       Submit to regular onsite evaluation by HHS of the CHC's compliance with requirements pertaining to use of both federal funds and non-grant funds. HRSA, Health Center Program Site Visit Protocol 108 (2025), https://bphc.hrsa.gov/sites/default/files/bphc/compliance/site-visit-protocol.pdf.

47.     The Initiative's requirement that no more than 10% of CHC revenues be spent on "management and overhead" expenses is in direct conflict with several of the above requirements, compliance with which requires more than 10% of individual CHCs revenues. Such federally-mandatory costs include, among others, the provision of outreach and enabling services required by 42 U.S.C. § 254b(b)(1)(A)(ii); activities undertaken to establish collaborative relationships with other providers and to reduce unnecessary emergency room usage required by 42 U.S.C. § 254b(k)(3)(B); maintaining "an ongoing quality improvement system" required by 42 U.S.C. § 254b(k)(3)(C); efforts to implement and comply with sliding fee discount and Medicare, Medicaid, and CHIP billing requirements required by 42 U.S.C. § 254b(k)(3)(E)—(G); preparation of federal funding applications and budget proposals required by 42 U.S.C. § 254b(e)(5)(A); compliance with federal accounting requirements, including annual audit requirements, required by 42 U.S.C. § 254b(k)(3)(C), 42 U.S.C. § 256b(q)(1), and implementing regulations; and mandatory participation in HRSA on-site visits.

COMPLAINT FOR DECL. AND INJ. RELIEF

**D.      HHS Exercises Plenary Oversight and Control of Health Center Expenditures.**

48.      CHCs' use of Section 330 funding is subject to strict compliance requirements to ensure that federal funds are used effectively, efficiently, in alignment with federally-defined health center program objectives, and in furtherance of each CHC's individualized HHS-approved grant project. CHCs' compliance with federal grants management requirements entails substantial effort, most, if not all, of which the Initiative would classify as management and overhead outside of "mission spend," despite the necessity of such effort under federal law.

49.      Federal control over CHCs' approved health center program budgets is plenary. CHCs are subject, as a condition of their Section 330 funding, to the Uniform Administrative Requirements, Cost Principles, and Audit Requirements for Federal Awards in 2 C.F.R. Part 200, which are incorporated by reference in each CHC's official HHS Notice of Award as a standard term and condition.

50.      As required by 2 C.F.R. § 200.308(f), CHCs must obtain HHS's prior written approval for, among others, any: change in the scope of the CHC's federal project (even if there is no associated budget revision), change in key personnel (including employees and contractors) identified by name or position in the Federal award, transfer of funds budgeted for participant support costs to other budget categories, inclusion of  particular costs requiring prior approval (*e.g.*, certain equipment and other capital expenditures), and changes in total approved cost-sharing.

51.      In accordance with 2 C.F.R. Part 200, HHS requires that all costs charged to a CHC's Section 330 grant be "allowable" as defined in 2 C.F.R. § 200.403, which requires that costs be: necessary and reasonable; in accordance with Generally Accepted Accounting Principles (GAAP); adequately documented; not used as cost-sharing in any other federally-funded program; and in conformance with limitations or exclusions appearing in the federal cost principles at 2 C.F.R. Part 200, Subpart E, health center program legislation, grant regulations, and/or grant-specific terms and conditions. 2 C.F.R. § 200.403.

52.      To be considered reasonable, and therefore allowable, a CHC's costs must, in nature and amount, not exceed that which would be incurred by a prudent person under the

circumstances prevailing at the time the decision was made to incur the cost. 2 C.F.R. § 200.404. HHS is empowered to determine whether a particular cost is reasonable.

53. A CHC cost is allocable to the Section 330 grant if it directly or indirectly benefits the health center program. 2 C.F.R. § 200.405.

54. Fines, penalties, damages, and other settlements are not allowable CHC costs. 2 C.F.R. § 200.441.

55. Taxes for which an exemption would be afforded to the Federal Government are not allowable CHC costs. 2 C.F.R. § 200.470(b).

56. General costs of State governments are likewise unallowable CHC costs. 2 C.F.R. § 200.444(a).

57. As to "overhead" costs, Part 200 authorizes CHCs to utilize a de minimis indirect cost rate of up to fifteen percent of modified total direct costs, which a CHC may use until it chooses to apply for a higher negotiated indirect cost rate agreement based on its actual overhead costs. 2 C.F.R. § 200.414(f). Indirect costs include facilities and administrative costs—*i.e.*, the infrastructure necessary to operate a CHC and administer its federally-supported and regulated health center project. Such costs may include essential expenses for management, maintenance, utilities, equipment, cleaning, IT systems, insurance, and personnel who are not directly involved in patient care but are nonetheless vital to health center operations (*e.g.*, compliance, finance, and management personnel).

58. CHCs' use of "nongrant funds" is also subject to federal control; such funds may not be used for prohibited purposes as noted above and must "further[] the objectives of the [health center] project." 42 U.S.C. § 254b(e)(5)(A), (D), (k)(3)(N); *see also* 42 C.F.R. § 51c.107 ("Any funds granted pursuant to this part, as well as other funds to be used in performance of the approved project, may be expended solely for carrying out the approved project in accordance with section 330 of the Act, the applicable regulations of this part, the terms and conditions of the award, and the applicable cost principles prescribed in 45 C.F.R. part 75, subpart E.").

59. A CHC's "total budget," as approved by HHS and subject to federal oversight and control, "includes the Health Center Program federal award funds and all other sources of revenue

COMPLAINT FOR DECL. AND INJ. RELIEF

in support of the health center scope of project." Health Resources and Services Administration, Health Center Program Compliance Manual, Chapter 17: Budget, at 55 n.2, 62 n.2., https://bphc.hrsa.gov/compliance/compliance-manual. A CHC activity is "grant-supported" even if not directly grant-funded: it is within a CHC's project – and subject to federal oversight and approval – if associated expenses and revenue are included within the CHC's HHS-endorsed total budget.

60.    In addition to generally applicable baseline requirements, HHS can place individualized conditions on awards to CHCs, including where the agency has assessed there to be additional risk related to the CHC's financial stability, history of performance, quality management systems, or other factors. 2 C.F.R. § 200.208(b); HRSA Compliance Manual, Chapter 2: Health Center Program Oversight, at 9, https://bphc.hrsa.gov/compliance/compliance-manual.

61.    To ensure compliance with these and other requirements, Congress requires HHS to offer CHCs "fiscal and program management assistance, training in fiscal and program management, [and] operational and administrative support." 42 U.S.C. § 254b(l).

62.    HHS may take immediate enforcement actions, including withholding payment to CHCs and terminating awards, if the CHC fails to demonstrate operational capacity or "no longer effectuates the program goals or agency priorities." 2 C.F.R. §§ 200.339, 200.340(a)(4); HRSA Compliance Manual, Chapter 2: Health Center Program Oversight 13-14, https://bphc.hrsa.gov/compliance/compliance-manual.

63.    Once HHS, via HRSA, approves a CHC's grant application and issues a Notice of Award ("NOA"), "the [NOA] and the grant terms are binding on the grantee and the government." *U.S. ex rel. Bauchwitz v. Holloman*, 671 F. Supp. 2d 674, 681 (E.D. Pa. 2009). A CHC must obtain prior federal approval "whenever there is to be a significant change in the scope or nature of [the CHC's] project activities." 42 C.F.R. § 51c.107(c); *see also* 2 C.F.R. § 200.308(b), (f) (enumerating circumstances requiring prior agency approval). CHCs must also generally obtain approval to carry over unobligated balances from previous budget periods to cover otherwise allowable costs in subsequent periods. 2 C.F.R. § 200.308.

COMPLAINT FOR DECL. AND INJ. RELIEF

**E.** **Congress Prevented Section 330 Funds from Subsidizing State Medicaid Programs by Providing CHCs with a Specific Medicaid Payment Right.**

64.     The Medicaid program was established in 1965 via Title XIX of the Social Security Act, *now codified at* 42 U.S.C. § 1396 *et seq.*, and is a cooperative federal-state program through which the federal government provides financial assistance to states so that they can furnish medical care to low-income individuals.

65.     The purpose of Section 330 funding is to cover each CHC's costs of providing required primary care and related services to uninsured and underinsured residents of its service area. Congress has prohibited the use of Section 330 funds to subsidize care to Medicaid beneficiaries (or any other publicly or privately insured individuals), as the cost of that care is expected to be covered with separately appropriated State and Federal Medicaid funds.

66.     To prevent such a subsidy, CHCs must, by statute: "make every reasonable effort to collect appropriate reimbursement for services" from all available funding sources, including state Medicaid programs, and may not discount their services, absent a patient's demonstrated inability to pay. 42 U.S.C. §§ 254b(k)(3)(F), (G). To reinforce these twin obligations, Congress in 1989 enacted a CHC payment right in Medicaid to ensure that Medicaid (not Section 330 funding) covers 100 percent of a CHC's reasonable and related costs of providing services to Medicaid beneficiaries. Omnibus Budget Reconciliation Act of 1989, Pub. L. No. 101-239, § 6404, 103 Stat. 2106, 2264 (1989).

67.     The Medicare, Medicaid and SCHIP Benefits Improvement and Protection Act of 2000 ("BIPA") amended federal law to establish a Prospective Payment System (PPS) to pay for covered ambulatory services furnished by CHCs, *i.e.*, "Federally-qualified health center [FQHC] services." Pub. L. No. 106-554, *codified at* 42 U.S.C. §§ 1396a(bb)(1)–(6); *see also Arizona All. for Cmty. Health Centers v. Arizona Health Care Cost Containment Sys.*, 47 F.4th 992, 1000 (9th Cir. 2022) ("[W]e conclude that FQHC services are a mandatory benefit under § 1396d(a)(2)(C).").

COMPLAINT FOR DECL. AND INJ. RELIEF

68. The defined set of services the PPS rate must cover consists of two components: (a) "[FQHC] services" and (b) "any other ambulatory services" offered by the CHC and otherwise included under the State plan. 42 U.S.C. § 1396a(bb)(1), 1396d(a)(2)(C), 1396d(l)(2).

69. To be in compliance with the Medicaid Act, California's PPS payment methodology must provide for a payment to each CHC (calculated on a per-visit basis) that is equal to 100 percent of the CHC's reasonable and related costs in furnishing covered ambulatory services (using the center's actual historical cost data for the years 1999 and 2000). Thereafter, each CHC's PPS rate must be adjusted annually for inflation and increases or decreases in the scope of services the PPS rate covers. *Id.* at § 1396a(bb)(1), 1396d(a)(2)(C), 1396d(l)(2); *see also Cmty. Health Ctr. v. Wilson-Coker*, 311 F.3d 132, 134 (2d Cir. 2002). The reimbursement to which FQHCs are entitled under 42 U.S.C. § 1396a(bb), is "intended to cover comprehensive services, including primary care, dental, mental health, prescriptions, enabling services that improve patient access to care and encourage healthy behavior." Cason Schmit, ORISE Fellow, Public Health Law Program, Centers for Disease Control and Prevention, *Medicaid Service Delivery: Federally Qualified Health Centers* 19, https://www.cdc.gov/phlp/docs/presentation-fqhc.pdf.

70. In certain circumstances, states may, rather than reimbursing through PPS, use an alternate payment methodology ("APM"); but an APM may only be used when (a) the CHC consents and (b) the APM results in a payment that is at least as much as the amount the PPS methodology requires. 42 U.S.C. § 1396a(bb)(6). The State must set forth any APM in its state plan.

71. Regardless of the payment methodology, California must reimburse CHCs for 100 percent of their reasonable and related costs in furnishing covered services to Medi-Cal beneficiaries. Given that Medi-Cal reimbursements account for a large percentage of many CHCs' revenues, the Initiative will inevitably claw back to California funds the Medicaid Act required the State to provide to CHCs, thereby lowering effective reimbursement below statutorily required minimums in violation of the Medicaid Act. As a result, the Initiative conflicts with federal law. *See, e.g., New Jersey Primary Care Ass'n, Inc. v. New Jersey Dept. of Human*

COMPLAINT FOR DECL. AND INJ. RELIEF

*Servs.*, 722 F.3d 527, 541 (3d Cir. 2013) (concluding "the FQHC should not be left holding the bag" where state-contracted managed care organizations failed to reimburse at PPS rates for covered services to Medicaid beneficiaries); *accord Cmty. Health Care Ass'n of New York v. Shah*, 770 F.3d 129, 154–55 (2d Cir. 2014) (recognizing Medicaid Act imposes "absolute burden on the state to reimburse FQHCs for the entirety of their reasonable costs" and rejecting policy that lowered reimbursement for covered services to eligible beneficiaries below such levels); *see also Rio Grande Cmty. Health Ctr., Inc. v. Rullan*, 397 F.3d 56, 64 (1st Cir. 2005) ("[S]ection 330 grants are for special purposes and cannot be used to cover the costs of services to Medicaid patients.").

## V

### UHW'S CALIFORNIA BALLOT INITIATIVE NO. 25-0008

72.    Since as early as 2022, UHW has been pressuring CHCs and CPCA to succumb to its labor demands—e.g., a statewide cooperation agreement, a "code of conduct" governing organizing and unionization activities, and other labor concessions—that would pave the way for dramatic, increased unionization at CHCs throughout California and thereby increase union dues revenue for UHW. The campaign included, among other things, exerting political pressure by sponsoring legislative bills and taking positions on other legislation that were adverse to CPCA's interests and those of its member CHCs, with the purpose of harassing CPCA and its members and forcing them to expend time, money, and resources.

73.    UHW and its president, Dave Regan, have a reputation of utilizing the state ballot initiative process to gain leverage over labor negotiations. Having filed or qualified fifty ballot initiatives over the past dozen years, UHW has shown little or no interest in the substance of their initiatives but rather has withdrawn 84 percent of them, usually in conjunction with securing concessions from dialysis centers, hospitals, and other health care providers that UHW has targeted. It is no surprise that a Sacramento Bee editorial has called Regan a "ballot measure extortionist." Christopher Cadelago, *Capitol Alert: Dave Regan, key to minimum wage fight, divides labor family*, Sacramento Bee (Apr. 10, 2016)  http://www.sacbee.com/news/politics-government/capitol-alert/article70811307.html.

74.    Regan and UHW are using the same strategy against CPCA and CHCs, to extract labor concessions with the threat of a punitive state ballot initiative that is facially defective. After other efforts to force CPCA to succumb to its labor demands failed, on July 15, 2025, UHW (through Defendants Fleming and Brown) filed Initiative No. 25-0008, also known as the "Clinic Funding Accountability and Transparency Act." The Initiative requires "clinics" to annually report their "Mission Spend Ratio" to the California Registry of Charities and Fundraisers, levies significant monthly fines on clinics that do not report, and extracts substantial penalties from clinics with spend ratios below ninety-percent, as determined by State officials.

75.    The Initiative defines "clinics" to include CHCs (by referencing nonprofit FQHCs and FQHC look-alikes). It further defines the so-called "Mission Spend Ratio" as "the total amount a health center spends on activities that accomplish each center's exempt purpose," divided by the CHC's total revenue reported on Part I of its IRS Form 990. Any revenue received—federal grants, nonfederal funding, and other revenue streams—must be subject to this spend ratio. The Initiative requires a CHC to spend a minimum of 90% of its total annual revenue (from federal and nonfederal sources), on a category of expenses categorized on the CHC's annual nonprofit tax filing as "program services."  Thus, a CHC is prohibited from spending more than 10% of its total annual revenue on non-program service expenditures, including expenses required by HHS and federal law as detailed above.

76.    Any CHC that violates the spending requirement under the Initiative is levied a penalty by the California Department of Public Health ("CDPH"). The penalty is equal to the difference between the clinic's 90% percent spending requirement and the actual amount the clinic spent on "program services." These penalties could total millions of dollars for CHCs.

77.    Penalty monies are to be held in a newly established "Mission Spend Ratio Penalty Account," and may be paid back if and when a violating health center: (1) comes into compliance with the Mission Spend Ratio requirement, i.e., can demonstrate it is spending at least ninety percent of its revenue on "mission-related" expenses, and (2) has a state-approved plan to spend the returned funds on mission-related expenses.

COMPLAINT FOR DECL. AND INJ. RELIEF

78.     The Initiative authorizes CDPH to spend penalty funds on, *inter alia*, "maintaining the Special Deposit Fund" and conducting compliance reviews. Any such expenses will be deducted from any reimbursement due when a CHC comes into compliance.

79.     If the CHC has not met the two conditions for curing noncompliance within five years, the Initiative authorizes the State to use collected penalty funds for "initiatives funding clinical worker training, recruitment, and retention."

80.     A Berkeley Research Group study of the measure found that the Initiative would force 88% of California CHCs to operate at a loss, putting those clinics at risk of closure and jeopardizing up to 11.7 million patient visits each year. Mandy Assgeirsson et. al, *Study of Potential Impacts from the Attorney General Initiative 25-0008A1*, Berkley Research Group (Nov. 2025). The study also determined that, *inter alia*:

- Most CHCs (91% or 183 of 202) analyzed by the researchers presently do not meet the Initiative's arbitrary 90% spend ratio requirement, and, as a result, would be forced to pay $1.7 billion in total penalties in the first year alone. CHCs would face similarly crippling penalties every year.

- Many of the projected "noncompliant" CHCs (64% or 117 out of 183) would, if required to pay the penalty, be put at risk of closure.

- CHCs projected to be at risk of closing provided between 1.3 million and 11.7 million patient encounters in 2023, including up to 7.7 million encounters from Medi-Cal patients.

- The strict 90% spend ratio would not allow CHCs to keep funding in reserves for major capital investments, such as opening new clinics, renovating existing clinical space, purchasing new equipment or technologies, investing in value-based care, and preparing for potential public health or other emergencies.

- The Initiative will increase State General Fund costs by more than $1 billion, primarily because displaced patients will be forced to receive care in more costly settings, such as hospital emergency rooms.

COMPLAINT FOR DECL. AND INJ. RELIEF

81.     On September 25, 2025, a nonpartisan analysis by California's Legislative Analyst's Office concluded that, under the Initiative: "[CHCs] might close if they cannot sufficiently adjust to the measure's requirements, which could shift patients to publicly operated safety net providers and increase state and local costs. The net effect on state and local governments of these potential changes is uncertain, and could range from limited to extensive."

## VI

### PRE-ELECTION CHALLENGE TO THE INITIATIVE

**A.     Qualification of the Initiative for the November 2026 Election**

82.     The California General Election is scheduled to be held on November 3, 2026, fixed by statute pursuant to California Elections Code section 324. In addition to the numerous federal, state, and local candidates that will be elected on that date, it is expected that there will be ten or more state ballot measures (*i.e.*, "state propositions" or "state initiatives") appearing on the same ballot. All prospective state propositions must qualify for the ballot 131 days before the General Election. *See* Cal. Const., art. II, § 8(c). In this case, the deadline to qualify the Initiative is June 25, 2026.

83.     Initiative proponents have a maximum of 180 days from the official title and summary date to circulate their petition, gather signatures, and submit the petition to county elections officials. Cal. Elec. Code § 9014. UHW's deadline to complete petition circulation in favor of the Initiative was April 6, 2026.

84.     Given that the Initiative would enact new statutes, UHW was required to collect at least 546,651 valid signatures of qualified voters to qualify the Initiative for the ballot. *See* Cal. Const., art. II, § 8(b) (5% of the total votes cast for Governor in the last election).

85.     On August 1, 2025, the California Attorney General's Office published the title and summary for the Initiative and thereby triggered the 180-day period to collect petition signatures. That day, UHW issued a press release in support of the measure and posted on its Instagram account: "The Clinic Funding Accountability and Transparency Act has received an

COMPLAINT FOR DECL. AND INJ. RELIEF

official title and summary from the Office of the California Attorney General. That means we are ready to start collecting signatures to qualify it for the November 2026 elections."

86.    Section 9034 of the California Elections Code provides that once the proponents of a proposed initiative measure have collected 25 percent of the total signatures required (currently 136,663 for an initiative statute), they must immediately certify to the Secretary of State, under penalty of perjury, that the threshold has been met. Cal. Elec. Code § 9034(a). On November 10, 2025, UHW submitted such certification for the Initiative.

87.    Starting on or about April 1, 2026, UHW began the process of submitting its petition to the 58 county Registrar of Voters.  It publicly announced that it had collected over 1 million petition signatures. According to the Secretary of State's most recent tabulation of the "raw count" of all petition signatures submitted to county election officials, UHW has, in fact, submitted over 1 million petition signatures within the statutory period of time to do so. Defendant Weber has now instructed the counties to commence the process of validating the petition signatures. In most counties, a "random sample" of signatures are selected and a validity rate is determined and applied to the total amount of signatures submitted within the county, as provided by Elections Code section 9030. Defendant Weber has instructed the counties that they must complete this process by May 27, 2026. Indeed, some counties have already proceeded to validate petition signatures pursuant to the random sampling provision of section 9030 of the California Elections Code. Because of the large number of gross signatures submitted, UHW only needs a validity rate of about 60 percent to qualify their measure. Plaintiffs are informed and believe that the typical validity rate for a statewide petition is well over 70 percent. Accordingly, the Initiative is very likely to qualify for the ballot pursuant to Section 9030.

88.    When a state initiative qualifies for the election through submission of sufficient valid signatures, Defendant Weber is required to notify the initiative proponents and the various county Registrars of such fact pursuant to Elections Code section 9033(a). On June 25, 2026, Defendant Weber will issue a "certificate of qualification" that the initiative has qualified for the upcoming November 3, 2026 General Election, pursuant to Elections Code section 9033(b). Thereafter, Defendant Weber will commence the process of preparing the State Voter

COMPLAINT FOR DECL. AND INJ. RELIEF

Information Guide. Cal. Elec. Code § 9082. The Voter Guide includes a title and summary prepared by the California Attorney General, an analysis of the proposed state initiative by the California Office of the Legislative Analyst, the text of the state initiative prepared by the California Legislative Counsel, and ballot arguments for and against submitted by voters and interested organizations. In addition, Defendant Weber must prepare and make available an audio recording and translations of these materials into several languages. Cal. Elec. Code §§ 9054, 9082.5.

89.     The materials in the Voter Guide are open for public inspection and potential litigation during a 20-day window prior to Defendant Weber's determination of the date necessary to commence printing the Voter Guide. Cal. Elec. Code § 9092. Thereafter, Defendant Weber must finalize the certified list of candidates and measures so that county elections officials can commence the printing of actual ballots in their respective jurisdictions. Plaintiffs are informed and believe that the State Voter Information Guide will be finalized and printing of it will commence on or about August 10, 2026, and that counties will commence to print ballots, including the qualified initiatives, shortly thereafter.

**B.      The Necessity and Timeliness of Pre-Election Review**

90.     Plaintiffs bring their Complaint in this Court while the Initiative petition verification process is underway because it is extremely likely the Initiative will qualify for the ballot. *See Vandermost v. Bowen*, 269 P.3d 446, 462 (Cal. 2012).

91.     The California Supreme Court has long held that pre-election review of California ballot measures is appropriate where the proposed initiative is not within the people's initiative power in the first instance, for example where the initiative is preempted by federal law. Also, where the invalidity of the proposal is clear, and where the matter can be resolved as a matter of law, a Court can step in to prevent the unnecessary expenditures of time and effort that would be involved in a futile election campaign. *Senate of the State of Cal. v. Jones*, 21 Cal. 4th 1142, 1154 (1999); *Brosnahan v. Eu*, 31 Cal. 3d 1, 4 (1982) (pre-election challenge to state initiative appropriate where there is "some clear showing of invalidity"). This is because "[t]he presence of an invalid measure on the ballot steals attention, time, and money from the numerous valid

propositions on the same ballot. It will confuse some voters and frustrate others, and an ultimate decision that the measure is invalid, coming after the voters have voted in favor of the measure, tends to denigrate the legitimate use of the initiative procedure." *American Federation of Labor v. Eu*, 36 Cal. 3d 687, 697 (1984).

92.    Post-election review of the Initiative could not yield adequate relief because the Initiative becomes effective immediately after certification of the election, Cal. Const., art. II, § 10(a), and the preempted provisions would govern clinic operations beginning in July 2027, with the practical and legal consequences arising far earlier. Regulated clinics, including Plaintiff Open Door and other CHC members of CPCA, would be compelled to undertake substantial, irreversible preparatory measures well in advance of July 2027, including restructuring budgets and service lines, renegotiating payer and vendor contracts, revising staffing models, modifying accounting and compliance systems, and reallocating capital expenditures. These expenditures of time and money cannot be fully recouped if the Initiative is later invalidated.

93.    Absent an injunction, Plaintiffs will suffer irreparable injury. Plaintiffs will be subject to UHW's and Regan's "ballot measure extortion scheme" and will be required to spend tens of millions of dollars attempting to defeat an unlawful Initiative conceived in bad faith, money which would otherwise be spent on patient care as directed by federal law and in keeping with the terms and conditions of each CHC's Section 330 grant agreement.

94.    An injunction will also serve the public interest by avoiding the harm to voters and the electoral process described by the California Supreme Court in *American Federation of Labor*, 36 Cal. 3d at 697. An injunction will avoid taxpayer dollars wasted on the preparation of ballot materials for an initiative that has no legal right to be on the ballot.

95.    The Initiative is invalid because it is preempted by federal laws, as set forth below. A pre-election challenge is warranted and appropriate.

COMPLAINT FOR DECL. AND INJ. RELIEF

**FIRST CAUSE OF ACTION**

**U.S. Const. art. VI, cl. 2**

**(Federal Preemption Based on Federally-Mandated Requirements on CHCs)**

96.    Plaintiffs hereby incorporate paragraphs 1 through 95 of the Complaint as if fully stated herein.

97.    The Supremacy Clause of the Constitution mandates that "[t]his Constitution, and the Laws of the United States which shall be made in Pursuance thereof . . . shall be the supreme Law of the Land . . . any Thing in the Constitution or Laws of any State to the Contrary notwithstanding." U.S. Const., art. VI, cl. 2. State legislatures may not invalidate or interfere with the operation of federal statutes or disregard federal law. In other words, "[t]he law of congress is paramount; it cannot be nullified by direct act of any state, nor the scope and effect of its provisions set at naught indirectly." *Anderson v. Carkins*, 135 U.S. 483, 490 (1890). State law is thus preempted and invalid if it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941), or if it "discriminate[s] against the United States or those with whom it deals," *South Carolina v. Baker*, 485 U.S. 505, 523 (1988).

98.    The Initiative is irreconcilable with the structure, purpose, and requirements of Section 330, its implementing regulations, and the terms and conditions of California CHCs' federal awards, including mandated compliance with 2 C.F.R. Part 200. The Initiative thwarts the application and enforcement of these mandatory federal requirements, including, without limitation, as follows:

a.    The Initiative prohibits CHCs from spending revenue (including federal grants and other financial support to CHCs) on statutorily required activities the Initiative defines to be outside of a CHC's "exempt purpose," such as efforts to establish collaborative relationships with other providers and to reduce unnecessary emergency room usage, quality improvement activities, preparation of federal funding applications and budget proposals, required reporting, and other non-clinical activities mandated by 42 U.S.C. § 254b, its implementing regulations, CHC grant terms and conditions, and HRSA policies.

COMPLAINT FOR DECL. AND INJ. RELIEF

b.      The Initiative's imposition of penalties for failing to meet the 90% spend ratio operates to divert CHC revenue to a general state fund, which can be used for post hoc purposes having nothing to do with CHC activities or purposes. Such a penalty scheme converts federal funds into a state tax on CHCs. The diversion of federal funds from CHCs conflicts with, frustrates, and interferes with federal law dictating the precise use of grant funds and requiring that CHCs' use of "nongrant funds" are subject to federal control; such nongrant funds may not be used for prohibited purposes as noted above and must "further[] the objectives of the [health center] project." 42 U.S.C. § 254b(e)(5)(A), (D), (k)(3)(N); *see also* 42 C.F.R. § 51c.107 ("Any funds granted pursuant to this part, as well as other funds to be used in performance of the approved project, may be expended solely for carrying out the approved project in accordance with section 330 of the Act, the applicable regulations of this part, the terms and conditions of the award, and the applicable cost principles prescribed in 45 C.F.R. part 75, subpart E.").

c.      The Initiative's restrictions on CHC spending, subject to significant penalties that would divert CHC revenue to a general state fund, conflicts with, frustrates, and interferes with the HHS Secretary's authority to annually review and approve CHC budgets, including de minimus (15%) and negotiated indirect cost rates that authorize the use of federal funds for CHC management, administration, and other overhead costs. Because such budgets conform to federal requirements on CHC operations and spending, they are mandatory.

d.      Compliance with the Initiative's fine and penalty provisions would force CHCs to violate federal law and conditions of federal grant awards: Section 330 funds may not be used for fines and penalties or to pay for State government functions, 2 C.F.R. § 200.441, 200.444; Section 330 funding may not be used to comply with state taxes that may not be levied against the federal government, 2 C.F.R. § 200.470(b); and health center program income may only be used in furtherance of the health center's federal project. 42 U.S.C. § 254b(e)(5)(A), (D), (k)(3)(N); *see also* 42 C.F.R. § 51c.107.

99.      The Initiative's diversion of federal funds and program income to CHCs directly impedes their ability to comply with Section 330 and to fulfill the statute's purpose to fund the planning, development, and operation of health centers. CHC grant funding and federal and

29

COMPLAINT FOR DECL. AND INJ. RELIEF

nonfederal program income that is tied up in a Special Deposit Fund or used for State-directed activities, as authorized by the Initiative, cannot be used to fulfill these purposes and would not qualify as allowable CHC expenditures.

100.    In purporting to control health center budgets and expenditures, the Initiative conflicts with Congress' expressed objective in enacting Section 330 to maintain control over the way CHCs are organized and administered, and to create a uniform "set of standards and services" health centers provide, S. Rep. No. 94-29, at 39 (1975), and is in irreconcilable tension with HHS's annual approval and significant control over each health center's budget.

101.    The Initiative violates the Supremacy Clause, is preempted by federal law applicable to CHCs, and hence is invalid and would be unenforceable if passed.

### SECOND CAUSE OF ACTION

### U.S. Const. art. VI, cl. 2

### (Federal Preemption Based on Federal Appropriations Law)

102.    Plaintiffs hereby incorporate paragraphs 1 through 101 of the Complaint as if fully stated herein.

103.    Federal law requires that all federal moneys appropriated, including those appropriated to the health center program, "shall be applied only to the objects for which the appropriations were made except as otherwise provided by law." 31 U.S.C. § 1301(a).

104.    The Initiative's artificial limitations around CHC expenditures of total revenue to a 90% spend ratio, along with enforcement scheme registration fees and penalties that will be imposed on most CHCs, constitute diversions of federal funds awarded to CHCs under the PHS Act through Congress's annual discretionary appropriations and mandatory Community Health Center Fund appropriations.

105.    The diversion of federal funds violates Congress's intent and federal statutory and regulatory requirements governing the use of such funds by CHCs.

106.    The Initiative accordingly violates the Supremacy Clause, is preempted by federal law restricting the appropriation of federal moneys for the health center program, and hence is invalid and would be unenforceable if passed.

COMPLAINT FOR DECL. AND INJ. RELIEF

**THIRD CAUSE OF ACTION**

**U.S. Const. art. VI, cl. 2**

**(Federal Preemption Based on Medicaid Act PPS Requirements)**

107.    Plaintiffs hereby incorporate paragraphs 1 through 106 of the Complaint as if fully stated herein.

108.    Federal law requires California to reimburse CHCs for 100 percent of their reasonable and related costs of providing services to Medicaid beneficiaries. Such costs include not only direct clinical costs, but also associated overhead.

109.    Year over year, Medi-Cal reimbursements account for a large portion of CHCs' total revenue. In 2024, 63% of total CHC revenue in California was received from Medi-Cal for services to beneficiaries. *See* Kaiser Family Foundation, *Community Health Center Revenues by Payer Source 2024*, https://www.kff.org/other-health/state-indicator/community-health-center-revenues-by-payer-source/?currentTimeframe=0&selectedDistributions=medicaid&sortModel=%7B%22colId%22:%22Location%22,%22sort%22:%22asc%22%7D.

110.    In diverting to California state coffers significant portions of health center operating budgets, much of which are made up of Medicaid reimbursements, the Initiative empowers California to unlawfully evade the Medicaid Act's PPS requirements by permitting the State to reclaim for itself mandated Medicaid payments made to health centers for services to Medicaid beneficiaries.

111.    The Initiative violates the Supremacy Clause, is preempted by federal Medicaid law, and hence is invalid and would be unenforceable if passed.

**FOURTH CAUSE OF ACTION**

**(Declaratory Judgment pursuant to 28 U.S.C. §§ 2201 and 2202)**

112.    Plaintiffs hereby incorporate paragraphs 1 through 111 of the Complaint as if fully stated herein.

113.    Plaintiffs are entitled to a judicial declaration that the Initiative violates the Supremacy Clause and is preempted by federal laws at this time. An actual controversy exists because Defendant Weber is statutorily bound to take actions to place the Initiative on the state

31

ballot at the November 2026 election when UHW submits the requisite number of petition signatures for certification, which is inevitable at this time. Defendant Weber must take such action regardless of the invalidity of the Initiative, in the absence of judicial intervention.

114.    Because the Initiative has qualified for the upcoming general election ballot, Plaintiffs and CPCA's CHC members have been forced to undertake expenditures and actions to fight the Initiative, including, without limitation, educating CHCs and the public, campaigning and fundraising to oppose the Initiative, combating UHW's disruptive protests and misinformation about the Initiative, and making preparations now in anticipation of the Initiative going into effect.

115.    CHCs also will have to pay registration fees to support the enforcement scheme to be established should the Initiative pass, and CHCs will be at risk of excessive fines and other private legal action if they somehow violate this unconstitutional Initiative. Plaintiff Open Door and Plaintiff CPCA, on behalf of itself and its CHC members, therefore request a judicial declaration that the Initiative is unconstitutional, violates the Supremacy Clause, is preempted by federal law, and therefore is invalid.

### PRAYER FOR RELIEF

WHEREFORE, Plaintiffs respectfully request that this Court:

1.    Enter a judgment declaring that California Ballot Initiative No. 25-00008 violates the Supremacy Clause and is therefore invalid;

2.    Enter a judgment declaring that California Ballot Initiative No. 25-00008 is preempted by federal laws governing CHCs and is therefore invalid;

3.    Enter a judgment declaring that California Ballot Initiative No. 25-00008 would cause the State of California to violate Medicaid payment requirements and is therefore invalid;

4.    Issue preliminary and permanent injunctions that prohibit Defendant Weber and the Office of the California Secretary of State, their successors, agents, and employees from printing and disseminating voter materials and ballots related to the Initiative and from taking

any other action to place the Initiative on the state ballot in November 2026 or any state ballot thereafter.

5.    Award Plaintiffs their costs in this action;

6.    Award any other relief it deems just and proper.

Dated: April 30, 2026.

**ATHENE LAW, LLP**

**POWERS PYLES SUTTER & VERVILLE PC**

**BELL, MCANDREWS & HILTACHK, LLP**

By:    _____/s/ Long X. Do_____
                        LONG X. DO

*Counsel for Plaintiffs California Primary Care Association and Open Door Community Health Centers*

COMPLAINT FOR DECL. AND INJ. RELIEF