Bruce Harland, SBN 230477
WEINBERG ROGER & ROSENFELD
1375 55th Street
Emeryville, CA 94608
(510) 337-1001
bharland@unioncounsel.net

Catha Worthman, SBN 230399
Darin Ranahan, SBN 273532
FEINBERG, JACKSON, WORTHMAN &
WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
(510) 269-7998
catha@feinbergjackson.com
darin@feinbergjackson.com

Stephen Kaufman, SBN 131605
Gary Winuk, SBN 190313
George Yin, SBN 213910
KAUFMAN LEGAL GROUP, APC
445 S. Figueroa Street
Suite 2400
Los Angeles, CA 90071
(213) 452-6566
skaufman@kaufmanlegalgroup.com
gwinuk@kaufmanlegalgroup.com
gyin@kaufmanlegalgroup.com

***Attorneys for Defendants Service Employees
International Union – United Healthcare Workers
West, Shawna Brown, Sean Fleming***

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA PRIMARY CARE ASSOCIATION; OPEN DOOR COMMUNITY HEALTH CENTERS, | Case No. 3:26-cv-03837-AGT |
| | Complaint Filed April 30, 2026 |
| *Plaintiffs*, | |
| | **PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PLAINTIFFS' MOTION FOR PRELIMINARY INJUNCTION** |
| vs. | |
| SHIRLEY N. WEBER, PH.D., in her official capacity as Secretary of State of the State of California; SERVICE EMPLOYEES INTERNATIONAL UNION – UNITED HEALTHCARE WORKERS WEST, as a real-party-in-interest proponent of California Ballot Initiative 25-0008; SHAWNA BROWN, in her capacity as the official proponent of California Ballot Initiative No. 25-0008; and SEAN FLEMING, in his capacity as the official proponent of California Ballot Initiative No. 25-00008, | Date: July 31, 2026<br>Time: 10:00 a.m.<br>Court: A, 15th Floor<br>Judge: Hon. Alex G. Tse |
| *Defendants*. | |

**TABLE OF CONTENTS**

Notice of Motion and Motion to Dismiss ......................................................................................1

Memorandum of Points and Authorities........................................................................................2

    I.    Introduction.........................................................................................................................2

    II.   Background .........................................................................................................................3

    III.  Argument ...........................................................................................................................5

        A.    The Court Lacks Subject Matter Jurisdiction (Rule 12(b)(1)). ...............................5

            1.    Plaintiffs Lack Article III Standing............................................................5

                a.    CPCA Cannot Establish Its Own Standing. .......................................7

                b.    Open Door's Asserted Injury Is Contingent and Self-Inflicted. ......7

                c.    Plaintiffs' Asserted Injuries Are Not Traceable to These Defendants or Redressable by the Relief They Seek...................................................8

            2.    The Claims Are Not Ripe..........................................................................9

                a.    The Issues Are Not Fit for Review. ...................................................9

                 b.    California's Doctrine Disfavoring Pre-Election Review Reinforces the Conclusion that This Dispute is Unfit for Review. ........................11

                c.    Withholding Review Works No Hardship. .......................................13

         B.    Plaintiffs Fail to State a Claim (Rule 12(b)(6)). ...................................................14

            1.    Plaintiffs Have Pled No Valid Cause of Action........................................14

            2.    Even If Plaintiffs Had Stated a Recognized Cause of Action, Their Preemption Theories Fail. ..........................................................................15

                a.    The Measure's Own Conflict-Avoidance Mechanisms Show It Obstructs No Federal Objective. ...........................................................................16

                b.    Obstacle Preemption Does Not Displace Either Spending Clause Statute—the Public Health Service Act or the Medicaid Act. ...........................18

                    i.    Section 330 of the Public Health Service Act Does Not Preempt the Initiative. ........................................................................................21

                    ii.    The Medicaid Act Does Not Preempt the Initiative..............................23

                c.    31 U.S.C. § 1301 Does Not Preempt the Initiative. ......................................26

         C.    Plaintiffs Are Not Entitled to a Preliminary Injunction (Rule 65(a)). .........................27

            1.    Plaintiffs Cannot Show a Likelihood of Success. .................................................28

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

2.    Plaintiffs Cannot Show Irreparable Harm.........................................................28

3.    The Balance of Equities and Public Interest Defeat the Motion............................30

4.    Alternatively, Any Injunction Requires a Substantial Rule 65(c) Bond................32

IV.  Conclusion ..........................................................................................................33

# TABLE OF AUTHORITIES

**Cases**

Abbott Labs. v. Gardner, 387 U.S. 136 (1967)................................................................9, 10

All. for the Wild Rockies v. Cottrell, 632 F.3d 1127 (9th Cir. 2011).......................................27

Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization, 22 Cal. 3d 208 (1978).......11

Angle v. Miller, 673 F.3d 1122 (9th Cir. 2012)..............................................................31

Arizonans for Official English v. Arizona, 520 U.S. 43 (1997) ..............................................10

Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (2015) ..........................2, 14, 15, 28

Ashcroft v. Iqbal, 556 U.S. 662 (2009)......................................................................14

Associated Gen. Contractors v. Coal. for Econ. Equity, 950 F.2d 1401 (9th Cir. 1991) ......................29

Associated Home Builders etc., Inc. v. City of Livermore, 18 Cal. 3d 582 (1976).........................11, 31

Baird v. Bonta, 81 F.4th 1036 (9th Cir. 2023)................................................................29

Bell Atl. Corp. v. Twombly, 550 U.S. 544 (2007) ..............................................................14

Brosnahan v. Eu, 31 Cal. 3d 1 (1982)......................................................................12, 13

Buckley v. Am. Constitutional Law Found., Inc., 525 U.S. 182 (1999) ......................................31

Cal. Farm Bureau Fed'n v. State Water Res. Control Bd., 51 Cal. 4th 421 (2011) ...........................23

Califano v. Sanders, 430 U.S. 99 (1977) ......................................................................9

California v. Azar, 911 F.3d 558 (9th Cir. 2018) ..............................................................27

California v. Texas, 593 U.S. 659 (2021) ...............................................................8, 9, 15

Caribbean Marine Servs. Co. v. Baldrige, 844 F.2d 668 (9th Cir. 1988) ......................................28

Carlsbad Union Sch. Dist. v. Rafferty, 300 F. Supp. 434 (S.D. Cal. 1969).....................................27

Chandler v. State Farm Mut. Auto. Ins. Co., 598 F.3d 1115 (9th Cir. 2010) .....................................5

Chase Brexton, 2006 WL 6593814 [full citation to be confirmed] ...........................................25

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ..............................................................9

City of Reno v. Netflix, Inc., 52 F.4th 874 (9th Cir. 2022) ...............................................2, 15

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013) ......................................................2, 6, 8

Cmty. Health Care Ass'n of N.Y. v. Shah, 770 F.3d 129 (2d Cir. 2014).........................................20

Cmty. Health Ctr., Inc. v. Wilson-Coker, 2006 WL 2583083 (D. Conn. Sept. 5, 2006)........................25

Cmty. Health Ctr., Inc. v. Wilson-Coker, 311 F.3d 132 (2d Cir. 2002) .................................25

Columbia Basin Apartment Ass'n v. City of Pasco, 268 F.3d 791 (9th Cir. 2001) ..................7

Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills, 321 F.3d 878 (9th Cir. 2003) ...................32

Conn. Primary Care Ass'n v. Wilson-Coker, 2006 WL 2583083 (D. Conn. Sept. 5, 2006) .................25

Costa v. Superior Court, 37 Cal. 4th 986 (2006) ...................................................12

DeBuono v. NYSA-ILA Medical & Clinical Servs. Fund, 520 U.S. 806, 814 (1997) .........................16

E. Bay Sanctuary Covenant v. Garland, 994 F.3d 962 (9th Cir. 2021) .............................6, 29

Elrod v. Burns, 427 U.S. 347 (1976) ................................................................28

FDA v. All. for Hippocratic Med., 602 U.S. 367 (2024) ...........................................2, 6

Golden State Transit Corp. v. City of Los Angeles, 493 U.S. 103 (1989) ...........................14

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982) ................................................6

Hines v. Davidowitz, 312 U.S. 52 (1941) ...........................................................15

Home for the Aged of the Little Sisters of the Poor v. McDonald, 711 F. Supp. 3d 81 (N.D.N.Y. 2024) ...................20

Hunt v. Wash. State Apple Advert. Comm'n, 432 U.S. 333 (1977) .......................................7

Indep. Energy Producers Ass'n v. McPherson, 38 Cal. 4th 1020 (2006)................................12

Indep. Living Ctr. of S. Cal., Inc. v. Shewry, 543 F.3d 1047 (9th Cir. 2008) ......................14

Kane v. De Blasio, 19 F.4th 152 (2d Cir. 2021) ....................................................28

Kansas v. Garcia, 589 U.S. 191 (2020)..............................................................15

La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest, 624 F.3d 1083 (9th Cir. 2010).6

Legislature v. Deukmejian, 34 Cal. 3d 658 (1983)..................................................12

Longshoremen v. Boyd, 347 U.S. 222 (1954) .........................................................10

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) .........................................5, 6, 8, 9

LULAC v. Wilson, 908 F. Supp. 755 (C.D. Cal. 1995) ................................................23

Lydo Enters., Inc. v. City of Las Vegas, 745 F.2d 1211 (9th Cir. 1984).............................29

McFadden v. Jordan, 32 Cal. 2d 330 (1948).........................................................12

Medtronic, Inc. v. Lohr, 518 U.S. 470 (1996) .....................................................16

Medtronic, Inc. v. Mirowski Family Ventures, LLC, 571 U.S. 191 (2014) .............................15

Meyer v. Grant, 486 U.S. 414 (1988) ..............................................................31

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

Nken v. Holder, 556 U.S. 418 (2009) ...................................................................................27

Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981) ........................................19

Pennsylvania Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139 (3d Cir. 2012)....................27

Perry v. Brown, 52 Cal. 4th 1116 (2011)..............................................................................31

PhRMA v. Walsh, 538 U.S. 644 (2003) ................................................................................20

Purcell v. Gonzalez, 549 U.S. 1 (2006) .............................................................................3, 11

Regents of the University of California v. American Broadcasting Cos., 747 F.2d 511, 519-20 (9th Cir. 1984)...............................................................................................................29

Renne v. Geary, 501 U.S. 312 (1991)....................................................................................10

Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc., 944 F.2d 597, 603 (9th Cir. 1991)............................................................................................................................29

Republican Nat'l Comm. v. Democratic Nat'l Comm., 589 U.S. 423 (2020)........................30

Rossi v. Brown, 9 Cal. 4th 688 (1995) ..................................................................................31

Safe Air for Everyone v. Meyer, 373 F.3d 1035 (9th Cir. 2004)............................................5

Sampson v. Murray, 415 U.S. 61 (1974) ..............................................................................29

Senate of the State of Cal. v. Jones, 21 Cal. 4th 1142 (1999)................................................12

Shepheard v. Godwin, 280 F. Supp. 869 (E.D. Va. 1968).....................................................27

Skelly Oil Co. v. Phillips Petroleum Co., 339 U.S. 667 (1950) ............................................15

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) ...............................................5, 9

Summers v. Earth Island Inst., 555 U.S. 488 (2009) ..............................................................7

Sw. Voter Registration Educ. Project v. Shelley, 344 F.3d 914 (9th Cir. 2003) ...................27

Texas v. United States, 523 U.S. 296 (1998)........................................................9, 10, 11, 13

Thomas v. Union Carbide Agric. Prods. Co., 473 U.S. 568 (1985) ........................................9

Three Lower Cntys. Cmty. Health Servs., Inc. v. Maryland, 498 F.3d 294 (4th Cir. 2007) ...........19, 20

United States v. California, 921 F.3d 865 (9th Cir. 2019).....................................................15

United States v. Martinez, 169 F.4th 1147 (9th Cir. 2026) .....................................................3

United States v. Salerno, 481 U.S. 739 (1987) ......................................................3, 16, 18, 21

Valley Forge Christian Coll. v. Ams. United for Separation of Church & State, Inc., 454 U.S. 464 (1982)..................................................................................................................6

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442 (2008) ........................18

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

Winter v. Nat. Res. Def. Council, Inc., 555 U.S. 7 (2008) .................................................27, 28

Wyeth v. Levine, 555 U.S. 555 (2009) ............................................................................................16

**Statutes**

28 U.S.C. §§ 2201–2202 ...............................................................................................................14

31 U.S.C. § 1301 ...............................................................................................................23, 26, 27

31 U.S.C. §§ 1341–1351 ................................................................................................................26

42 U.S.C. § 1396a(bb) ............................................................................................... 19, 20, 23, 24

42 U.S.C. § 1396d(l)(2)(B) ...........................................................................................................21

42 U.S.C. § 254b .......................................................................................................................18, 21

Cal. Elec. Code § 9017 ..................................................................................................................32

Cal. Elec. Code §§ 9050–9087 ......................................................................................................30

**Other Authorities**

Assemb. B. 1113, 2025–2026 Reg. Sess. (Cal. 2025) ......................................................................4

**Rules**

Fed. R. Civ. P. 12(b)(1) .........................................................................................................passim

Fed. R. Civ. P. 12(b)(6) .........................................................................................................passim

Fed. R. Civ. P. 65(a) .........................................................................................................2, 13, 27

Fed. R. Civ. P. 65(c) .................................................................................................................32, 33

**Regulations**

2 C.F.R. § 200.425 ........................................................................................................................22

2 C.F.R. § 200.427 ........................................................................................................................22

2 C.F.R. § 200.430 ........................................................................................................................22

2 C.F.R. § 200.431 ........................................................................................................................22

2 C.F.R. § 200.437 ........................................................................................................................22

2 C.F.R. § 200.441 ...................................................................................................................22, 23

2 C.F.R. § 200.447 ........................................................................................................................22

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

2 C.F.R. § 200.452 ................................................................................................................22

2 C.F.R. § 200.470 ................................................................................................................22

2 C.F.R. pt. 200 ....................................................................................................................19

42 C.F.R. § 51c.107 ..............................................................................................................23

42 C.F.R. pt. 51c ..................................................................................................................19

**Constitutional Provisions**

U.S. Const. art. I, § 8, cl. 1...........................................................................................18, 19

U.S. Const. art. III .......................................................................................................1, 5, 7, 28

U.S. Const. art. VI, cl. 2 .................................................................................................passim

**NOTICE OF MOTION AND MOTION TO DISMISS**

TO ALL PARTIES AND THEIR ATTORNEYS OF RECORD:

PLEASE TAKE NOTICE THAT on July 31, 2026, at 10:00 a.m., or as soon thereafter as the matter may be heard, in Courtroom A, 15th Floor, of the United States District Court for the Northern District of California, San Francisco Division, located at 450 Golden Gate Avenue, San Francisco, California, before the Honorable Alex G. Tse, Defendants Service Employees International Union – United Healthcare Workers West, Shawna Brown, and Sean Fleming (the "Proponent Defendants") will and hereby do move this Court for an order dismissing the complaint pursuant to Federal Rule of Civil Procedure 12(b)(1) for lack of subject-matter jurisdiction and, in the alternative, pursuant to Rule 12(b)(6) for failure to state a claim upon which relief can be granted. By the same motion, the Proponent Defendants oppose Plaintiffs' motion for a preliminary injunction (Dkt. No. 28).

The motion is made on the grounds that the Court lacks subject-matter jurisdiction because Plaintiffs do not have Article III standing and their claims are not ripe. Additionally, even if the Court reaches the merits, Plaintiffs have not pleaded any cognizable cause of action to enjoin the placement of a qualified initiative on the ballot; and Plaintiffs cannot carry their burden of establishing any of the requirements for the extraordinary remedy of a preliminary injunction.

This motion is based on this Notice of Motion and Motion; the accompanying Memorandum of Points and Authorities; the complaint, pleadings, and records on file in this action; and such other written and oral argument and matters as may be presented before or at the hearing.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

**MEMORANDUM OF POINTS AND AUTHORITIES**

Defendants Service Employees International Union – United Healthcare Workers West, Shawna Brown, and Sean Fleming (collectively, the "Proponent Defendants") submit this combined memorandum in support of their motion to dismiss under Federal Rules of Civil Procedure 12(b)(1) and 12(b)(6) and in opposition to Plaintiffs' motion for a preliminary injunction under Rule 65(a). Because the complaint's flaws cannot be cured by amendment, Defendants request that it be dismissed with prejudice.

## I.    INTRODUCTION

Plaintiffs ask a federal court to take the extraordinary act of barring the people of California from voting on a ballot measure—the Clinic Funding Accountability and Transparency Act—that hundreds of thousands of petition signers have sought to place on the November 2026 statewide general election ballot. The measure has not been decided upon by California voters. It is not yet law and may never become law. Accordingly, Plaintiffs' complaint faces two threshold jurisdictional bars. First, Plaintiffs have no standing, as their asserted "impending" injuries are resources they have *chosen* to spend opposing the measure—they constitute advocacy, not injury, *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394-95 (2024)—and any operative harm depends on a chain of contingencies (passage of the Initiative by voters, issuance of Attorney General guidance, passage of a full fiscal year, a noncompliant expense ratio calculation, a penalty assessment, and the absence of a waiver) that is not "certainly impending," *Clapper v. Amnesty Int'l USA*, 568 U.S. 398, 409 (2013). Second, those same contingencies render the claims unripe. Both defects independently require dismissal under Rule 12(b)(1) regardless of the merits.

Even if the Court were to reach the merits, the complaint fails twice over. Plaintiffs have pleaded *no* recognized cause of action. Neither the Supremacy Clause nor the Declaratory Judgment Act supply a valid federal cause of action on their own. *See Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015); *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022). This fatal defect constitutes a failure to state a claim under Rule 12(b)(6) without the Court even needing to delve further into the specific theories Plaintiffs argue.

Beyond that defect, Plaintiffs' three preemption theories each fail as a matter of law because each rests on the same premise—"an obstacle to the accomplishment and execution of the full purposes and objectives of Congress"—that the Initiative studiously *avoids*. Specifically, the initiative provides for binding Attorney General guidance that could avoid any purported conflict, waiver of its requirements for economically distressed clinics, and return of escrowed penalties for clinics that come into compliance. A facial challenge cannot succeed against a measure with a wide field of federally consistent applications. *United States v. Salerno*, 481 U.S. 739, 745 (1987); *United States v. Martinez*, 169 F.4th 1147, 1153 (9th Cir. 2026). Beyond this common, fatal flaw, Plaintiffs' Public Health Service Act, federal appropriations statute, and Medicaid Act preemption theories each also fail because Plaintiffs overread the preemptive reach of each statute and under-state the role of the state in protecting public health and nonprofit corporate accountability, as further discussed below.

Finally, should the Court reach it, Plaintiffs' proposed preliminary injunction should be denied. Plaintiffs ask a federal court to strike a duly qualified measure from the ballot on the eve of a statewide election—the precise interference *Purcell v. Gonzalez*, 549 U.S. 1 (2006) (per curiam), instructs federal courts to avoid. The harms they allege are contingent on numerous, speculative intervening factors, self-inflicted, or both. An injunction, by contrast, would inflict concrete and unrecoverable harm on the proponents and the electorate alike: it would forfeit the qualified ballot position the proponents earned, and override the people's right to decide the measure now. Plaintiffs' motion should be denied and the complaint dismissed with prejudice.

## II.    BACKGROUND

The Clinic Funding Accountability and Transparency Act, designated Initiative 25-0008A1 (Pls.' Req. for Jud. Not. Ex. 1, Dkt. No. 28-1) ("Init."), would establish a "Mission Spend Ratio" for nonprofit federally qualified health centers (FQHCs): a standard directing that a clinic devote at least ninety percent of its total revenue to expenditures on its exempt purpose, administered by the California Attorney General and the Department of Public Health.[1] The measure does not fix what

---

[1] The measure adds Government Code section 12586.3 ("§ 12586.3) and Health and Safety Code section 1234.1 ("§ 1234.1"), among other provisions. Internal section citations are to the provisions the Initiative adds.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

counts toward that standard. It gives the Attorney General binding-guidance authority to determine what qualifies as an expenditure on a clinic's exempt purpose, including authority to credit expenditures that do not appear as program-service expenses on a clinic's Form 990. § 12586.3(b)(1)-(2). It authorizes the Department of Public Health to waive the requirement, or set an alternative ratio, on a showing of economic hardship or a threat to a clinic's ability to continue as a going concern, with renewals available without limit. § 1234.1(c). And it provides that any penalty is held in escrow and refunded to a clinic that comes into compliance and agrees on a spending plan with the Department of Public Health. § 1234.1(a)(2)-(3).

The measure addresses concerns about transparency, accountability, and public health, as set forth in its findings. If it passes, the People will have found that, although nonprofit clinic boards are charged with reviewing executive compensation and directing revenue to patient care, many California clinics spend disproportionate shares of revenue on management and administration—"sometimes 30 to 40 percent of total revenue"—while some report annual surpluses "as much as 20 percent of total revenue," yet clinic workers report chronic understaffing, turnover, and long patient wait times. Init. § 2(d)-(g). The measure responds by setting "a reasonable minimum standard of mission-directed spending as a proportion of total revenue." *Id.* § 2(h).

The mission-spend concept did not originate with the Initiative; the Legislature had previously considered a comparable clinic-spending standard in its 2025-26 session—AB 1113—although the legislation did not pass. Proponents filed the operative, amended version of the Initiative with the Attorney General on September 8, 2025. *See* Req. for Jud. Not. Ex. 1, Dkt. No. 28-1. The Initiative subsequently qualified for the November 3, 2026 statewide general-election ballot on May 18, 2026, after the Secretary of State determined that its proponents had collected over 630,000 valid signatures—well above the 546,651 required to qualify a statutory initiative for the 2026 election. RJN Ex. 2, Dkt. No. 28-2. Qualification was the product of an election-cycle-specific campaign to gather and validate those signatures and to organize for a November 2026 vote, including significant expenditures by Service Employees International Union – United Healthcare Workers West (SEIU-UHW), which frequently advocates on workforce and quality of care issues on behalf of its

approximately 100,000 healthcare worker members.[2] The measure has not been adopted by California voters. It is not law, and by its terms its standard does not apply to any clinic until that clinic's "first full fiscal year beginning at least 6 months after passage." Init. § 8. Plaintiffs—an association of community health centers and a single member center—filed this action on April 30, 2026, before the measure had even qualified, and now move to enjoin the Secretary of State from placing it on the ballot.

### III.    ARGUMENT

**A.    The Court Lacks Subject Matter Jurisdiction (Rule 12(b)(1)).**

Plaintiffs ask a *federal* court to enjoin the people from voting on a measure that is not yet law. Their procedural choice dooms their challenge at the outset due to this Court's limited jurisdiction, as (1) Plaintiffs lack Article III standing; and (2) their claims are not ripe. Each, standing alone, requires dismissal under Rule 12(b)(1). *See Chandler v. State Farm Mut. Auto. Ins. Co.*, 598 F.3d 1115, 1122 (9th Cir. 2010) ("Because standing and ripeness pertain to federal courts' subject matter jurisdiction, they are properly raised in a Rule 12(b)(1) motion to dismiss.").

Plaintiffs bear the burden of establishing federal court jurisdiction. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 561 (1992). A facial attack under Rule 12(b)(1) accepts the complaint's allegations as true and asks whether they suffice to invoke the Court's jurisdiction. *Safe Air for Everyone v. Meyer*, 373 F.3d 1035, 1039 (9th Cir. 2004). Standing and ripeness are threshold questions that must be resolved before any merits or preliminary-injunction inquiry. Taking Plaintiffs' allegations as true, they establish neither. A federal court must assure itself of jurisdiction before proceeding to the merits; it may not assume jurisdiction in order to reach a merits question. *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 93-95 (1998).

**1.    Plaintiffs Lack Article III Standing.**

The "irreducible constitutional minimum of standing" requires an injury in fact that is (A) "concrete and particularized" and "actual or imminent, not conjectural or hypothetical";

---

[2] *See*, *e.g.*, https://www.seiu-uhw.org/press/healthcare-workers-deliver-signatures-to-qualify-clinic-funding-accountability-and-transparency-act-for-november-2026-ballot/; https://holdclinicsaccountable.org/#the-initiative.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

(B) "fairly traceable to the challenged action of the defendant, and not the result of the independent action of some third party not before the court"; and (C) likely to be redressed by a favorable decision. *Lujan*, 504 U.S. at 560-61 (citation modified). A "threatened injury must be certainly impending to constitute injury in fact"; "allegations of possible future injury are not sufficient." *Clapper*, 568 U.S. at 409 (citation modified). An injury resting on "a highly attenuated chain of possibilities" is *not* "certainly impending." *Id.* at 410. Plaintiffs, as the party invoking federal court jurisdiction, bear the burden on each element. *See Lujan*, 504 U.S. at 561. The two Plaintiffs here occupy different postures—CPCA sues as a membership association, Open Door as a single health center—and neither carries that burden.

In addition, "an organization that has not suffered a concrete injury caused by a defendant's action cannot spend its way into standing simply by expending money to gather information and advocate against the defendant's action." *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394 (2024). An organization may not establish standing "based on the intensity of the litigant's interest" or its "strong opposition to the government's conduct." *Id.* at 394 (quoting *Valley Forge Christian College v. Americans United for Separation of Church & State, Inc.*, 454 U.S. 464, 486 (1982)). And a diversion-of-resources theory does not change the analysis: *Alliance* confirmed that diversion supports standing only where the challenged action "directly affected and interfered with [the organization's] core business activities," not where the organization elects to spend money opposing a policy it dislikes. *Id.* at 395 (explaining *Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982)). As the Court found in *Alliance*, a theory that spending money opposing a policy one objects to "would mean that all the organizations in America would have standing to challenge almost every [] policy that they dislike, provided they spend a single dollar opposing those policies." *See id.*

The Ninth Circuit requires the same. Even before *Alliance*, it held that an organization "cannot manufacture the injury by incurring litigation costs or simply choosing to spend money fixing a problem that would not affect the organization at all." *E. Bay Sanctuary Covenant v. Garland*, 994 F.3d 962, 974 (9th Cir. 2021) (quoting *La Asociacion de Trabajadores de Lake Forest v. City of Lake Forest*, 624 F.3d 1083, 1088 (9th Cir. 2010)). Instead, it must show "that it would have suffered some other injury if it had not diverted resources to counteracting the problem." *Id.*

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

### a.    CPCA Cannot Establish Its Own Standing.

CPCA does not have standing to pursue this case on its own behalf or on behalf of its members. CPCA's asserted injury to itself is the staff time and resources it has devoted to studying, opposing, and, now, litigating against the Initiative. However, such expenditures are clearly not sufficient to constitute standing under binding Supreme Court precedent: they are the type of advocacy spending that *Alliance* specifically disavowed. And, the "possible future injury" from the Initiative is too attenuated to confer standing under *Clapper*. CPCA does not and could not allege that the Initiative—which is not yet law—has impaired any service it provides to anyone (and the Initiative itself has no direct impact on CPCA, an advocacy organization, not an FQHC subject to the Initiative).

CPCA also cannot establish associational standing on behalf of its members. In a claim seeking only declaratory and injunctive relief, an association may sue for its members only if "(a) its members would otherwise have standing to sue in their own right"; and "(b) the interests it seeks to protect are germane to the organization's purpose . . . ." *Columbia Basin Apartment Ass'n v. City of Pasco*, 268 F.3d 791, 798-99 (9th Cir. 2001) (quoting *Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977)). CPCA fails the first prong, which is dispositive. No member clinic has standing, because none faces the imminent injury Article III requires—every member's exposure depends on the same chain of contingencies that defeats Open Door's standing, set out below. Nor may CPCA satisfy the first prong by invoking its membership in the aggregate. An organization must "identify members who have suffered the requisite harm," and the "statistical probability that some of [its] members are threatened with concrete injury" will not do. *Summers v. Earth Island Inst.*, 555 U.S. 488, 497-99 (2009).

### b.    Open Door's Asserted Injury Is Contingent and Self-Inflicted.

Open Door fares no better on its own behalf. The Initiative imposes no obligation on any clinic now, and none will attach unless a chain of contingent events unfolds: the electorate must adopt the measure in November; the Attorney General must issue guidance defining what counts toward the mission-spend numerator—which is "adjusted based on guidance issued by the Attorney General," not fixed to any Form 990 line (§ 12586.3(b)(1)(A), (b)(2)); a clinic's "first full fiscal year beginning at least 6 months after passage" must run (§ 8); the clinic must report and the Attorney General must

calculate a ratio below ninety percent (§ 12586.3(e)); and the Department of Public Health must assess a penalty (§ 1234.1(b)) on the clinic, which must neither have cured nor obtained a waiver (§ 1234.1(c)). To the extent Open Door points to campaign contributions it has made opposing the measure, that spending is voluntary: a plaintiff "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416.

Open Door's anticipatory operational changes fare no better. The budget recalibrations, paused capital projects, and deferred hiring that Open Door and CPCA's other members describe are steps they have chosen to take in anticipation of a measure that is not law and may never become law. Self-imposed costs of that kind are not injury in fact. *See Clapper*, 568 U.S. at 416. The harm these clinics claim to anticipate—a penalty that can only be assessed after passage of the Initiative, the opportunity for Attorney General guidance, passage of a full fiscal year, a sub-ninety-percent ratio calculation, and the denial of any waiver requests to the Department of Public Health—is the paradigm of a speculative harm that is not "certainly impending." *Id.* at 409-10.

        **c.**      **Plaintiffs' Asserted Injuries Are Not Traceable to These Defendants or Redressable by the Relief They Seek.**

Plaintiffs' asserted injury also fails the traceability requirement. Self-inflicted injury of the kind Plaintiffs describe is not fairly traceable to any Defendant. *See Clapper*, 568 U.S. at 416.[3] And to the extent Plaintiffs look past their own choices to the prospect of an enforceable obligation, that prospect only begins to materialize if the electorate adopts the Initiative in November—"the independent action of some third party not before the court." *Lujan*, 504 U.S. at 560. Where a causal chain "depends upon the decision of an independent third party," standing is "substantially more difficult" to establish, and the plaintiff must show "at the least that third parties will likely react in predictable ways." *California v. Texas*, 593 U.S. 659, 675 (2021) (citation modified). Plaintiffs cannot

---

[3] SEIU-UHW and the Proponents' advocacy for the Initiative, an exercise of their First Amendment right to petition under the United States and California constitutions, does not and cannot independently create standing here for either CPCA or OpenDoor to request that the Initiative be withheld from the ballot, because the Initiative remains to be voted on by the people, and then interpreted and implemented if it passes. That is, any injuries caused remain subject to speculative, contingent future events; they are not actual or imminent.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

show that a statewide electorate will predictably enact the Initiative. The asserted injury thus turns on a contingent, independent choice that may never be made—the antithesis of a traceable, non-speculative injury.

Redressability independently fails. The relief Plaintiffs seek is prospective—an order barring the Secretary from placing the measure on the ballot. Even assuming the resources Plaintiffs say they have already devoted to studying, opposing, and adjusting to the measure could qualify as injury—and for the reasons given they cannot—a prospective injunction would not redress them. An order operating only going forward cannot restore funds already spent or undo adjustments already made. "Relief that does not remedy the injury suffered cannot bootstrap a plaintiff into federal court." *Steel Co.*, 523 U.S. at 107; *see City of Los Angeles v. Lyons*, 461 U.S. 95, 105-06 (1983). Plaintiffs' only forward-looking harm—the prospect of a penalty—supplies no separate, presently redressable injury. For the reasons just given, that harm cannot arise unless and until the electorate adopts the measure and the Attorney General and the Department of Public Health later act. A contingent harm that does not yet exist and may never occur is not a present injury that prospective relief could remedy. *Lujan*, 504 U.S. at 560.

### 2. The Claims Are Not Ripe.

The same contingencies that defeat injury-in-fact independently render the claims unripe. "A claim is not ripe for adjudication if it rests upon contingent future events that may not occur as anticipated, or indeed may not occur at all." *Texas v. United States*, 523 U.S. 296, 300 (1998) (quoting *Thomas v. Union Carbide Agric. Prods. Co.*, 473 U.S. 568, 580-81 (1985)) (citation modified). Ripeness requires the Court "to evaluate both [a] the fitness of the issues for judicial decision and [b] the hardship to the parties of withholding court consideration." *Abbott Lab'ys v. Gardner*, 387 U.S. 136, 149 (1967) *abrogated on other grounds by Califano v. Sanders*, 430 U.S. 99, 105 (1977). Neither prong favors Plaintiffs.

### a. The Issues Are Not Fit for Review.

Plaintiffs' preemption arguments assume the Attorney General will construe the mission-spend numerator in the most restrictive way conceivable—locking it to a single Form 990 line and refusing to credit federally driven administrative costs. The text contravenes that assumption: the numerator is

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

"adjusted based on guidance issued by the Attorney General" (§ 12586.3(b)(1)(A)), and the Attorney General may, "[c]onsistent with subparagraph (B)" (requiring guidance to further the objectives of the Initiative), count expenditures that "do not qualify as program service expenses on the Form 990 but that the Attorney General determines to nevertheless be spent on the clinic's exempt purpose" (§ 12586.3(b)(2)(A)(iii)). Until that guidance issues, the conflict Plaintiffs posit is nonexistent and undefined, and any ruling would rest on a guess about how an authority not yet exercised will be used. As the Supreme Court explained in materially identical circumstances where a state sought to adjudicate the lawfulness of a statutory sanction before any occasion to apply it, "[t]he operation of the statute is better grasped when viewed in light of a particular application." *Texas v. United States*, 523 U.S. at 301. A measure committing construction to a state officer who has not yet acted is not ripe for facial preemption review.

Similarly, no state court has had an opportunity to construe the state law proposed by the Initiative, further counseling against a federal court weighing in at this early stage. *See id.* ("the remoteness and abstraction are increased by the fact that [the law at issue] has yet to be interpreted by the [state] courts" and "[t]hus, '[p]ostponing consideration of the questions presented, until a more concrete controversy arises, also has the advantage of permitting the state courts further opportunity to construe' the provisions.") (quoting *Renne v. Geary*, 501 U.S. 312, 323 (1991)); *see also Arizonans for Official English v. Ariz.*, 520 U.S. 43, 48 (1997) ("Federal courts lack competence to rule definitively on the meaning of state legislation").

These contingencies also render the dispute abstract. Plaintiffs do not ask the Court to resolve a present conflict between federal law and an operative state enactment. They ask it to forecast whether a measure that has merely qualified for the ballot—and may never become law—would conflict with federal statutes if adopted and once construed. Resolving "the scope . . . of legislation in advance of its immediate adverse effect in the context of a concrete case involves too remote and abstract an inquiry for the proper exercise of the judicial function." *Texas v. United States*, 523 U.S. at 301 (quoting *Longshoremen v. Boyd*, 347 U.S. 222, 224 (1954)); *see Abbott Lab'ys*, 387 U.S. at 148-49 (ripeness spares courts from "entangling themselves in abstract disagreements over administrative

policies and also . . . protect[s] the agencies from judicial interference until an administrative decision has been formalized and its effects felt in a concrete way by the challenging parties").

Plaintiffs' contrary suggestion—that the measure reaches back to tax year 2024 and "retroactively" penalizes spending already past (Mot. 7-8)—misreads the definitions. The reference to "the Form 990 as of calendar year 2024 . . . or such successor portion of clinics' tax reporting" identifies which iteration of an evolving IRS form supplies the reporting line items. Section 8 separately fixes when the standard applies: "each clinic's first full fiscal year beginning at least 6 months after passage." Init., § 8. Plaintiffs' own hedge—"[i]t thus appears" (Mot. 7)—concedes the text does not compel their reading. At minimum, which reading governs is a question of state-law construction committed in the first instance to the Attorney General's guidance and the state courts— one more respect in which the dispute is unfit for facial federal review now. *Texas v. United States*, 523 U.S. at 301.

### b. California's Doctrine Disfavoring Pre-Election Review Reinforces the Conclusion that This Dispute is Unfit for Review.

As stated in *Purcell*, "[a] state indisputably has a compelling interest in preserving the integrity of its election process." 549 U.S. at 4 (quoting *Eu v. San Francisco County Democratic Central Comm.*, 489 U.S. 214, 231 (1989)). As such, the Court should consider California's extensive jurisprudence on the impropriety of pre-election review. California courts affirm that the People's right to propose legislation is "one of the most precious rights of our democratic process." *Associated Home Builders, etc. Inc. v. City of Livermore,* 18 Cal. 3d 582, 591 (1976). Indeed, in California, courts have a "solemn duty to 'jealously guard' the initiative power, it being 'one of the most precious rights of our democratic process.'" *Amador Valley Joint Union High Sch. Dist. v. State Bd. of Equalization,* 22 Cal. 3d 208, 248 (1978) (quoting *Associated Home Builders*, 18 Ca.. 3d at 591). "[I]f doubts reasonably can be resolved in favor of the use of the initiative," they "should [be] so resolve[d] . . . ." *Id.* "It has long been [California courts'] judicial policy to apply a liberal construction to this power wherever it is challenged in order that the right be not improperly annulled." *Associated Home Builders*, 18 Cal. 3d at 591 (citation modified). Thus, California courts have repeatedly held that "it is usually more appropriate to review constitutional and other challenges to ballot propositions or

initiative measures after an election rather than to disrupt the electoral process by preventing the exercise of the people's franchise, in the absence of some clear showing of invalidity." *Brosnahan v. Eu,* 31 Cal. 3d 1, 4 (1982); *accord Legislature v. Deukmejian,* 34 Cal. 3d 658, 665-66 (1983); *Costa v. Super. Ct.,* 37 Cal. 4th 986, 1005 (2006).

The reason for the doctrine against pre-election review is straightforward. Post-election review avoids unnecessary adjudication, protects the fundamental constitutional interests of initiative proponents and voters, and prevents courts from deciding complex and politically charged questions in haste. Indeed, "[i]f the measure passes, there will be ample time to rule on its validity. If it fails, judicial action will not be required." *Deukmejian*, 34 Cal. 3d at 666. Where a challenge can be resolved after the election, courts should consider whether it is preferable to avoid the "charged and rushed atmosphere" of pre-election review and instead leave the issue for "full, unhurried briefing, oral argument, and deliberation" after the voters have acted. *Independent Energy Producers Assn. v. McPherson*, 38 Cal. 4th 1020, 1025 (2006).

To be sure, California law recognizes some very limited circumstances in which pre-election review may be appropriate. Those circumstances generally involve threshold defects that determine whether the measure may be submitted to the voters at all: for example, whether the measure is legislative or administrative in character, whether it is a constitutional revision rather than an amendment, whether it violates the single-subject rule, or whether the proponents failed to comply with essential procedural requirements for qualification. *See Senate of the State of Cal. v. Jones,* 21 Cal. 4th 1142, 1153-1154 (1999); *Costa*, 37 Cal. 4th at 1005-07; *Deukmejian*, 34 Cal. 3d at 666-67; *McFadden v. Jordan,* 32 Cal. 2d 330, 331-32 (1948). Even then, California courts consistently hold that pre-election removal is a "dramatic step" appropriate only when the court is absolutely confident the challenge is meritorious and therefore justifies withholding a measure that has qualified for the ballot. *Costa*, 37 Cal.4th at 1007-08.

In any event, this case is not one of those rare cases. Plaintiffs have not shown that the Initiative is clearly invalid, nor do they identify a clear threshold defect in the initiative process. Instead, Plaintiffs ask the Court to conduct an anticipatory merits review of the Initiative's substantive legality and potential future operation. That is precisely the type of challenge California courts reserve

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

for post-election review. *See Brosnahan*, 31 Cal. 3d at 4. If this case were adjudicated in state court, undoubtedly post-election review would be deemed to be fully adequate.

The Plaintiffs' requested injunction would therefore invert California's constitutional tradition. It would deny the electorate the opportunity to vote on a duly qualified statewide initiative signed by hundreds of thousands of verified California voters (a minimum of 546,651 valid voter signatures was required to qualify an initiative statute for the 2026 election) based not on a clear threshold defect, but on Plaintiffs' ineffective substantive arguments as well as their speculative and disputed predictions about the measure's future legal effect. California law counsels the opposite: absent clear invalidity or a true threshold defect, courts should not "disrupt the electoral process by preventing the exercise of the people's franchise." *Brosnahan*, 31 Cal. 3d at 4. California law principles reinforce the Court's conclusion that Plaintiffs' issues are not fit for review.

### c.    Withholding Review Works No Hardship.

No clinic owes anything now or in the near term. The requirements apply only to a clinic's "first full fiscal year beginning at least 6 months after passage" (§ 8); penalties follow only thereafter, and only as to clinics that fall below the ratio, fail to cure, and obtain no waiver (§ 1234.1(b)–(c)). As in *Texas*, no party is "required to engage in, or to refrain from, any conduct," unless and until the contingent events occur. 523 U.S. at 301. Planning a budget in anticipation of a contingent measure is a discretionary choice, not a present legal compulsion. The prospect of having to plan is no more a cognizable hardship than the generalized "threat to federalism" the *Texas* Court dismissed as "an abstraction." *Id.* at 302. The delayed effective date confirms the point: even if the measure passes, no obligation attaches until a full fiscal year beginning at least six months after passage has run (§ 8)— well after the November election, after the Attorney General has an opportunity to issue guidance, and after the waiver process exists. These multiple contingencies defeat ripeness.

*        *        *

Either defect—the lack of standing and of ripeness—independently deprives the Court of jurisdiction and requires dismissal under Rule 12(b)(1). If the Court determines that it has no jurisdiction, its inquiry stops and it need not further consider the propriety of dismissal under Rule 12(b)(6) or of a preliminary injunction under Rule 65.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

**B.      Plaintiffs Fail to State a Claim (Rule 12(b)(6)).**

The Court need not and should not proceed beyond the jurisdictional issues to dismiss this case, as Plaintiffs cannot establish standing and ripeness. To the extent the Court reaches the merits of the preemption claims, Rule 12(b)(6) would provide further justification for dismissal. A complaint must plead "enough facts to state a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007); *see Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009). Whether the Supremacy Clause affords a cause of action, and whether the asserted federal statutes preempt the measure, are pure questions of law suited to resolution on the pleadings.

**1.      Plaintiffs Have Pled No Valid Cause of Action.**

Without needing to explore the specific facts or laws at issue here, it is clear that *none* of Plaintiffs' four causes of action—three under the Supremacy Clause of the United States Constitution and one under the Declaratory Judgment Act—is valid as a matter of law, necessitating dismissal.

As for the first three causes of action, the Supremacy Clause itself creates no cause of action, a fatal defect in Plaintiffs' complaint. "[T]he Supremacy Clause is not the source of any federal rights, and certainly does not create a cause of action." *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 324-25 (2015) (citation modified) (quoting *Golden State Transit Corp. v. City of Los Angeles*, 493 U.S. 103, 107 (1989)). "It instructs courts what to do when state and federal law clash, but is silent regarding who may enforce federal laws in court, and in what circumstances they may do so." *Id.* at 325. That alone forecloses Plaintiffs' first three causes of action, which rest solely on the Supremacy Clause. *See* Compl. ¶¶ 96-111, Dkt. No. 1. Plaintiffs' contrary authority predates *Armstrong* and was abrogated by it. The Ninth Circuit did recognize a standalone Supremacy Clause challenge in *Independent Living Center of Southern California, Inc. v. Shewry*, 543 F.3d 1047 (9th Cir. 2008). *See* Mot. 14:22-24, Dkt. No. 28. But, the Supreme Court later ruled in *Armstrong* that "[t]he Ninth Circuit erred" in doing so. *See* 575 U.S. at 324-27. Plaintiffs' first three causes of action thus are entirely reliant on an authority that the Supreme Court has explicitly abrogated.

Plaintiffs' fourth cause of action, for declaratory relief under 28 U.S.C. §§ 2201 and 2202, fares no better. *See* Compl. ¶¶ 112-15. "[T]he Declaratory Judgment Act [codified at 28 U.S.C. §§ 2201-02] does not provide an affirmative cause of action where none otherwise exists." *City of Reno*

*v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022) (citations omitted). It is remedial only: it enlarges the range of remedies available in federal court but supplies no cause of action and "alone does not provide a court with jurisdiction." *California v. Texas*, 593 U.S. 659, 672 (2021) (citing *Skelly Oil Co. v. Phillips Petroleum Co.*, 339 U.S. 667, 671-72 (1950)). A declaratory-judgment claim must therefore rest on an independent substantive predicate; declaratory relief "cannot alone supply jurisdiction otherwise absent." *Id.* at 673 (citing *Medtronic, Inc. v. Mirowski Family Ventures, LLC*, 571 U.S. 191, 197 (2014)). The only predicate Plaintiffs offer is the federal preemption asserted in their first three causes of action—and the Supremacy Clause supplies no cause of action to press it. *Armstrong*, 575 U.S. at 324-25. Relabeling the requested relief "declaratory" adds a remedy, not the missing right; the fourth cause of action fails with the first three.

### 2. Even If Plaintiffs Had Stated a Recognized Cause of Action, Their Preemption Theories Fail.

Only if the Court determines that it has jurisdiction—which it does not—and that Plaintiffs have pleaded proper causes of action—which they have not—does it need to wade into the merits of their preemption theories. Plaintiffs' motion presses obstacle preemption alone—the single standard that a state law is displaced when it "stand[s] as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941) (Mot. 14).

> [T]o determine whether obstacle preemption exists, the Supreme Court has instructed that [courts] employ [their] judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects. The Court has emphasized that implied preemption analysis does not justify a freewheeling judicial inquiry into whether a state statute is in tension with federal objectives; such an endeavor would undercut the principle that it is Congress rather than the courts that preempts state law. A high threshold must be met if a state law is to be preempted for conflicting with the purposes of a federal Act.

*United States v. California*, 921 F.3d 865, 879 (9th Cir. 2019) (citation modified). The possibility that federal funding preferences might be upset is not grounds for preemption on its own, for the Supremacy Clause "gives priority to 'the Laws of the United States,' not the . . . priorities or preferences of federal officers." *See Kansas v. Garcia*, 589 U.S. 191, 211-12 (2020). These conclusions are reinforced by the presumption against preemption. "[I]n all pre-emption cases, and particularly in those in which Congress has 'legislated . . . in a field which the States have traditionally

---

15

occupied,' . . . we 'start with the assumption that the historic police powers of the States were not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress.'" *Wyeth v. Levine*, 555 U.S. 555, 565 (2009) (quoting *Medtronic, Inc. v. Lohr*, 518 U.S. 470, 485 (1996)). Regulation of nonprofit public-benefit corporations, their charitable spending, and the State's own health-care safety net lies at the core of traditional state authority. *See, e.g.*, *DeBuono v. NYSA-ILA Medical & Clinical Servs. Fund*, 520 U.S. 806, 814 (1997) ("noting that the historic police powers of the State include the regulation of matters of health and safety" and that "[w]hile the HFA is a revenue raising measure, rather than a regulation of hospitals, it clearly operates in a field that has been traditionally occupied by the States") (citation modified).

**a.    The Measure's Own Conflict-Avoidance Mechanisms Show It Obstructs No Federal Objective.**

The measure frustrates no federal objective. It commands no clinic to curtail any federally required activity; it sets a standard computed on total revenue and keyed to spending on each clinic's exempt purpose—a broad category of charitable health-center activity—and its text supplies three mechanisms—crediting expenditures as mission spend based on Attorney General guidance, waiving the mission spend requirement based on a clinic's economic condition, and escrowing and refunding any penalty on compliance—that allow the State to avoid any potential conflict. A measure that leaves the federal objective intact erects no obstacle to it, and a fortiori makes dual compliance possible. Because these mechanisms give the measure a wide field of federally consistent applications, and a facial challenge fails unless "no set of circumstances exists under which the Act would be valid," *Salerno*, 481 U.S. at 745, the measure is not preempted on its face, and the Court need not address the three theories one by one to deny the motion.

The conflict avoidance mechanisms are expansive, and largely ignored in Plaintiffs' brief. *See* Mot. 7. First, the 90% Mission Spend Ratio's numerator and denominator are not fixed. The measure does not lock "[t]otal sums spent on a clinic's exempt purpose" (the numerator) to line 4e of the Form 990; it provides that the figure "shall be adjusted based on guidance issued by the Attorney General . . . ." § 12586.3(b)(1)(A). Similarly, it does not lock "[t]otal revenue for the organization" (the denominator) to line 12 of the Form 990; that figure, too, "shall be adjusted based on guidance issued

16

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

by the Attorney General . . . ." § 12586.3(b)(1)(B). Separately, the Attorney General is "authorized to issue binding guidance" on how the two figures are reported, § 12586.3(b)(2), and is expressly empowered to issue guidance on the reporting of "expenditures that do not qualify as program service expenses on the Form 990 but that the Attorney General determines to nevertheless be spent on the clinic's exempt purpose," § 12586.3(b)(2)(A)(iii). Plaintiffs' conflict theory mischaracterizes the text by assuming federally driven administrative and overhead costs are categorically excluded from the numerator and thereby penalized. Plaintiffs' projections (Mot. 8-10) inherit the same error: they assume that the expenses they identify could not be reported on the Form 990's program-service line, lock the numerator to that line, and assume no Attorney General guidance and no waivers. This construction is contrary to the actual text of the Initiative, which is built to avoid the type of conflict Plaintiffs allege.

Second, a clinic that could not meet the ratio is not necessarily subject to a penalty. The measure authorizes the Department of Public Health to grant waivers for "a temporary pause of the 90 percent requirement or for an alternative mission spend ratio requirement, on the basis of unexpected or exceptional circumstances or the clinic's economic condition." § 1234.1(c)(1). These waivers are renewable, without limit on the number of renewals. § 1234.1(c)(7). The economic-condition track is meant to address the very harm Plaintiffs invoke: a clinic qualifies by showing that compliance "would raise doubts about the clinic's ability to continue as a going concern under generally accepted accounting principles," § 1234.1(c)(3), and the governing factors include actual or likely closure of facilities, loss of patient services, loss of jobs, rural or frontier status, and "negative operating margins," § 1234.1(c)(4). A clinic facing the financial distress Plaintiffs describe thus has a textual path to relief before any obligation attaches.

Third, the penalty is neither necessarily permanent nor a charge against federal funds. Penalties paid, expenditures made under a Department-approved compliance plan, and reimbursements are "exclude[d] from both the total amount spent on activities and total revenue" in the ratio itself, § 12586.3(a)(2), so a penalty cannot drive a clinic further below the threshold. And penalties are "held in escrow for a period of five years," § 1234.1(a)(2), throughout which they are reimbursed to a clinic that comes into compliance and agrees on a spending plan with the Department,

17

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

§ 1234.1(a)(3). For a clinic that complies, the measure works no permanent extraction. Moreover, the measure is silent on the source of the penalty—it attaches to the clinic as an entity, not a particular funding stream.

Finally, the Initiative includes a severability clause that provides that "[i]f any provision of this act or its application is held invalid, that invalidity shall not affect other provisions or applications that can be given effect without the invalid provision or application." Init. § 7.

Together these mechanisms ensure that the measure has a wide set of applications that avoid any potential conflict—clinics that meet the ratio based solely on the IRS form 990 data, clinics that meet the ratio due to Attorney General guidance, clinics that obtain a waiver from the Department of Public Health, and clinics whose escrowed penalties are returned. A facial preemption challenge cannot succeed against a measure with such applications. *Salerno*, 481 U.S. at 745; *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 (2008) (a facial challenge requires showing the law "unconstitutional in all of its applications"). At a minimum, the measure is readily susceptible to a construction that avoids any conflict Plaintiffs imagine—and the construction that will govern, the Attorney General's binding guidance, has not yet been issued. A court does not strike a measure on its face by assuming the most preemption-prone reading of authority the implementing officer has had no occasion to exercise. *Wash. State Grange*, 552 U.S. at 450 (declining to invalidate a voter initiative where the State had "no opportunity to implement" it or "to accord the law a limiting construction to avoid constitutional questions"). For the reasons discussed above in Section III.A.2; the same contingencies that render the claims unripe render the asserted conflict hypothetical. In short, the conflict-avoidance mechanisms written into the text confirm there is no present, irreconcilable conflict for the Court to resolve, and thus no preemption.

### b. Obstacle Preemption Does Not Displace Either Spending Clause Statute—the Public Health Service Act or the Medicaid Act.

FQHCs draw on two distinct federal funding streams, and the Initiative displaces neither. The first is the Section 330 grant. Under the Public Health Service Act, HRSA awards grants to support a center's delivery of primary care to medically underserved patients, capped at the amount by which the center's operating costs exceed the other operational revenue it expects to receive. 42 U.S.C.

§ 254b(e)(5)(A). What a center may charge to that grant is governed by federal grant law—the program regulations at 42 C.F.R. Part 51c and the government-wide Office of Management and Budget Uniform Guidance cost principles at 2 C.F.R. Part 200. The Uniform Guidance is not health-center-specific; it is the generic set of administrative, cost, and audit rules for federal grants across agencies and recipients, and it reaches a center only to the extent it is incorporated into that center's award. It prescribes how a recipient treats costs charged to the grant; it sets no program goals for health centers and directs no deployment of a center's other revenue.

The second stream is Medicaid payment. When a center treats a Medi-Cal enrollee, the State reimburses the service under the Medicaid Act's prospective payment system—not a grant, but per-visit reimbursement set at 100 percent of the center's reasonable, related costs from a statutory base period and adjusted annually for inflation and scope-of-service changes. 42 U.S.C. § 1396a(bb)(1)-(3).

The two regimes complement rather than overlap: the grant cost principles define what a center may charge its federal award, and § 1396a(bb) defines how the State pays for covered Medicaid services. *See Three Lower Cnties. Cmty. Health Servs., Inc. v. Md.*, 498 F.3d 294, 297-98 (4th Cir. 2007). They are administered from opposite directions. Section 330 is federally administered: HRSA awards the grant, approves each center's scope of project and budget, and audits and enforces the award's conditions; the State is not a party to that grant. Medicaid FQHC payment is the inverse—a program the State itself administers and pays, including by defining reasonable and related costs and setting the payment mechanics. *Cmty. Health Ctr., Inc. v. Wilson-Coker*, 311 F.3d 132, 137 (2d Cir. 2002).

Both the Public Health Service Act and Medicaid Act are Spending Clause legislation, and both fail the obstacle inquiry for the same threshold reason before they fail for reasons unique to each. Spending Clause legislation "is much in the nature of a contract: in return for federal funds, the States agree to comply with federally imposed conditions," binding only a recipient that accepts the terms and only where Congress has spoken "unambiguously." *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981). Legislation of that character is a poor vehicle for obstacle preemption: it operates by inducement rather than command, while obstacle preemption requires a clear indication that Congress meant to displace state law against a presumption that it did not. *Wyeth*, 555 U.S. at 565

19

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

That is perhaps why Plaintiffs identify no decision—and Proponents are aware of none—holding a state law obstacle-preempted by either Section 330 or the Medicaid Act. In each instance the absence reflects the structure of the statute. Section 330 is a direct federal grant: its conditions bind a clinic's use of the federal award, run to the clinic rather than to the State, and are enforced by the awarding agency's withholding of funds—not by displacing a State's independent regulation of the nonprofits it charters. The Medicaid Act is cooperative-federalism legislation that "expressly contemplates the interaction between federal and state law." *Home for Aged of* Little Sisters of the Poor *v. McDonald*, 711 F. Supp. 3d 81, 108 (N.D.N.Y. 2024) (citing *Cmty. Health Care Ass'n of N.Y. v. Shah*, 770 F.3d 129, 134-35 (2d Cir. 2014)). A scheme designed around state participation supplies no single federal "purpose," at a high enough level of generality, that ordinary state regulation can be said to obstruct. *Cf. PhRMA v. Walsh*, 538 U.S. 644, 675-80 (2003) (Thomas, J., concurring in the judgment) (warning of "the impossibility of defining 'purposes' in complex statutes at such a high level of abstraction"). Consistent with both structures, where courts have set aside state measures touching these programs they have done so only for conflict with a specific statutory command, not with a program's general objectives. *See, e.g.*, *Three Lower Counties Community Health Servs. v. Md.*, 498 F.3d 294 (4th Cir. 2007) (state reimbursement practice failed to satisfy the express per-visit payment command of § 1396a(bb)(5)); *cf. Walsh*, 538 U.S. 644 (rejecting obstacle preemption premised on a program's general objectives).

These theories are, moreover, peculiarly unsuited to the facial challenge Plaintiffs bring. A facial attack requires Plaintiffs to show the Initiative is invalid in every application, *Salerno*, 481 U.S. at 745, yet whether either statute could even arguably conflict with the measure depends on facts that differ clinic by clinic. Some covered clinics receive no Section 330 grant at all, so the grant supplies no condition to conflict with; and because the grant is a residual subsidy capped at a clinic's operating shortfall, 42 U.S.C. § 254b(e)(5)(A), its share of revenue—and thus any purported friction with a total-revenue standard—varies widely among those that do. The Medicaid side varies no less: the share of a clinic's revenue drawn from PPS reimbursement turns on its particular patient and payer mix, which Plaintiffs' own declarations show ranges widely across their members. A preemption theory whose application would require clinic-by-clinic analysis of funding streams cannot establish

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

the uniform, across-the-board invalidity a facial challenge demands; at most it frames a fact-bound, as-applied inquiry that this posture does not present.

### i.    Section 330 of the Public Health Service Act Does Not Preempt the Initiative.

Plaintiffs' lead theory—that Section 330 authorizes categories of expenditure the Mission Spend Ratio penalizes, forcing clinics into a "Hobson's choice," Mot. 15-16—fails because it never establishes the factual premise on which it depends, and because nothing in Section 330 or its governing cost rules sets a federal floor on non-program spending that a State standard could transgress.

The theory assumes what it must prove. Plaintiffs catalog expenditures Section 330 authorizes—new delivery sites, expanded services, translation, outreach to homeless populations, substance-use-disorder treatment, and the like, Mot. 16 (citing 42 U.S.C. § 254b(e))—and assert that they fall outside the ninety-percent mission spend requirement. But the mission spend ratio's initial numerator is the "total program service expenses" reported on line 4e of Part III of a clinic's Form 990. Mot. 7. Plaintiffs never identify which Section 330-authorized expenditures are excluded from that line, nor show that the excluded amount exceeds ten percent of total revenue for any clinic, much less every clinic. On a facial challenge that omission is dispositive. And even as to a cost that is excluded, the measure is susceptible to a conflict-avoiding construction for the reasons already explained—the Attorney General's binding-guidance authority to credit federally required spending, and the Department of Public Health's waiver authority—which Plaintiffs' theory ignores. *See supra* § III.B.2.a. A measure susceptible to a conflict-avoiding construction is not facially preempted. *Salerno*, 481 U.S. at 745.

The theory also fails outright for a definable class of covered clinics. The Initiative reaches clinics by their exempt character and total revenue, not by receipt of a Section 330 grant; it applies, for example, to FQHC look-alikes—entities HRSA certifies as meeting Section 330's requirements but that receive no Section 330 grant. § 12586.3(a)(1); *see* 42 U.S.C. § 1396d(l)(2)(B). As to any covered clinic that holds no grant, there is no grant condition for the measure to obstruct, and the Section 330 theory cannot apply at all. *Salerno*, 481 U.S. at 745.

Plaintiffs' cost-rule citations do not supply the missing federal command that the Initiative would obstruct. The Uniform Guidance provisions they invoke (2 C.F.R. §§ 200.425, .427, .430-.431, .437, .447, and .452, Mot. 17) define what a grantee may charge to its federal award. They express no policy on how a clinic allocates its total revenue, do not require a grantee to incur any minimum amount of overhead, and say nothing about a State's authority to adopt a program-spending standard. A federal permission to spend is not a federal command to spend, and tension with what federal law permits is not the actual conflict preemption requires. *Kansas*, 589 U.S. at 211-12. The *de minimis* rate confirms the point: § 200.414(f) is an option for recovering indirect costs against the award absent a negotiated rate—a floor on unnegotiated cost recovery as between a clinic and HRSA, not a minimum a clinic must spend on overhead, and not a ceiling on the State's authority to require that revenue be devoted to program services.

Plaintiffs separately contend that the Uniform Guidance "prohibits compliance with the Initiative's fine and penalty provisions," citing 2 C.F.R. §§ 200.441 and 200.470(b). Mot. 17–18. It does no such thing. Section 200.441 is a cost-allowability rule: it provides that costs a recipient incurs from violations of state law are "unallowable"—not chargeable to the federal award—and so presupposes that if a penalty is owed it would be paid out of other revenues. However, even if it were not, to the extent the penalty is "incurred as a result of compliance with specific provisions of the Federal award"—i.e. all the terms from the Uniform Guidance and other regulations Plaintiffs cite as being in conflict with the Initiative—Section 200.441 has its own conflict-avoidance measure, allowing such penalties to be charged. Section 200.441 neither forbids a clinic from paying a state penalty nor purports to reach the state statute that imposes it. Section 200.470(b) is inapposite for the separate reason that it concerns taxes that may not be levied against the federal government, whereas the Initiative's penalty runs against the clinic and is structured as a penalty, not a tax. Even if it were a tax, a cost-allowability rule confers no tax immunity on grantees.

Even if the penalty were a tax, the federal cost-allowability rule for taxes does not supply the FQHCs a shield: 2 C.F.R. § 200.470(b) makes certain taxes *unallowable as federal charges*—a rule about what may be billed to an award—not a conferral of tax immunity on grantees. To the extent Plaintiffs invoke state authority for the proposition, a regulatory exaction is not transmuted into a tax

22

on federal property. *See Cal. Farm Bureau Fed'n v. State Water Res. Control Bd.*, 51 Cal. 4th 421, 437 (2011). In all events, that is a state-law characterization that cannot supply the federal preemption Plaintiffs must show. Section 200.441 is of a piece. It renders costs from violations of law "unallowable"—that is, not chargeable to the federal award. Like the rest of the cost principles, it is bookkeeping for the grant, not a prohibition on the grantee incurring the cost, much less an immunity from the underlying state law. Nothing in the Initiative requires that a penalty be charged to a federal award, and a clinic that paid one from its non-grant revenue would violate no federal rule. That a clinic's accounts may commingle federal and other funds does not convert a general obligation measured by total revenue into a charge against the award—for the same reason § 1301(a) does not trace appropriated dollars through a recipient's accounts.

Plaintiffs' one health-center authority, *LULAC v. Wilson*, 908 F. Supp. 755 (C.D. Cal. 1995), confirms the distinction. The conflict there arose from a state command to *deny* federally required care—Proposition 187 directed publicly funded facilities to withhold non-emergency services the PHS Act requires them to provide. *Id.* at 783-84. The Initiative issues no such command; it sets a revenue-ratio standard and mandates the denial of no service to anyone.

Finally, Plaintiffs' contention that federal law controls a clinic's nongrant funds and program income (Compl. ¶¶ 98(b), 99) overreads its sources. Section 254b(e)(5)(D) authorizes a clinic's use of program income for project purposes and for other purposes not specifically prohibited. Section 51c.107 governs only funds "used in performance of the approved project," not the entirety of a clinic's revenue. Neither section unambiguously imposes control over a clinic's nongrant revenue or displaces a State's authority over the nonprofit corporations it charters. *See Pennhurst*, 451 U.S. at 17. In sum,  Plaintiffs have not shown that the Initiative obstructs any objective of Section 330. They have not shown that the expenditures they invoke fall outside the ratio, the measure is susceptible to a construction that avoids the conflict they posit, and no federal provision sets a floor on non-program spending the Initiative could transgress.

### ii.    The Medicaid Act Does Not Preempt the Initiative.

Plaintiffs' Medicaid theory fails because § 1396a(bb) reaches only the dollars a State reimburses a clinic for treating Medicaid patients, and the Initiative touches none of that conduct.

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

Section 1396a(bb) governs Medicaid reimbursement—the prospective payment system, the scope-of-services adjustment, and the per-visit method—and the Initiative changes none of it. It does not reduce, condition, or recompute any Medicaid payment. The State continues to pay each clinic 100 percent of its reasonable per-visit cost. The Mission Spend Ratio operates several steps removed: it is computed on a clinic's total revenue from all sources and total mission-directed spending for all services, § 12586.3(a)(2), (b)(1). That gap is dispositive, and it does not depend on how much of any clinic's revenue is from Medicaid. Section 1396a(bb) commands a *payment*—the State must reimburse each clinic 100 percent of its reasonable per-visit cost—and says nothing about how a clinic spends the dollars it receives. The Mission Spend Ratio operates only on that latter dimension. Because the ratio is measured against total revenue, a clinic drawing most of its revenue from Medicaid will necessarily direct some of those reimbursement dollars to program services to comply; but that constrains only the clinic's *use* of funds already paid, not the payment § 1396a(bb) protects. The statute is satisfied when California pays 100 percent of reasonable cost—which it continues to do—and nothing in it confers a federal right to spend reimbursements free of state regulation. Indeed, a standard that channels revenue toward patient-care spending runs *with*, not against, the Medicaid Act's purpose of paying clinics to serve Medicaid patients. Because the Initiative reduces, conditions, and recomputes no reimbursement in *any* application, the theory fails on the merits and a fortiori cannot support facial relief. *Salerno*, 481 U.S. at 745.

The penalty is an all-payer regulatory penalty, not a Medicaid clawback. It recaptures no reimbursement: it is assessed on the total-revenue ratio, not on Medicaid visits or payments, and it redirects no federal payment. Nor is it permanent—penalties are excluded from the ratio and held in escrow for return upon compliance. *See* § 12586.3(a)(2); § 1234.1(a)(2)-(3); *supra* § III.B.2.a. A measure that denies no reimbursement is not "every bit as unlawful" (Mot. 22) as a formula that pays less than 100 percent of reasonable cost. Whatever Plaintiffs establish about their members' payor mix, the consequences they assert—that a total revenue spending standard is a charge against Medicaid reimbursement—does not follow.

Plaintiffs' reimbursement authorities confirm the distinction rather than close it, because each operated on the per-visit rate itself. *See* Mot. 21. In *Chase Brexton*, Maryland's "cap and ceiling"

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

reduced an FQHC's reasonable-and-related costs before the per-visit rate was computed, dropping the rate below 100 percent of reasonable cost. 2006 WL 6593814, at *2. Connecticut's productivity screen reduced the per-visit rate for facilities below a minimum visit count. *Cmty. Health Ctr., Inc. v. Wilson-Coker*, 2006 WL 2583083, at *2 (D. Conn. Sept. 5, 2006). The Mission Spend Ratio alters no rate. California continues to reimburse 100 percent of reasonable cost, and a clinic that changes its scope of services may seek a rebase under California's change-in-scope process. Plaintiffs' authorities police how a State sets its reimbursement rate; they say nothing about a revenue-ratio standard that leaves the rate untouched.

*Chase Brexton* in fact cuts against Plaintiffs. The court *rejected* the FQHCs' contention that federal law preempts a State's authority over FQHC costs, accepting CMS's position that, "in the absence of contrary regulations, 'States have broad authority to define reasonable costs for purposes of their Medicaid payment to FQHCs.'" *Chase Brexton*, 2006 WL 6593814, at *3-*4 (quoting *Cmty. Health Ctr., Inc. v. Wilson-Coker*, 311 F.3d 132, 137 (2d Cir. 2002)). It confirmed that States may "take reasonable action to implement caps and ceilings" on FQHC costs. *Id.* at *4. Maryland's cap fell on a single, inapposite ground—ordinary arbitrary-and-capricious review of the agency's rulemaking, determining that the agency chose its figure "out of the air" without a reasoned basis, *id.* at *4-5. This has no application to a voter initiative, which is not agency rulemaking subject to such review. Plaintiffs' parenthetical reports the result and omits the ground. Mot. 22. Their remaining authority holds even less. It did not invalidate Connecticut's screen but rather held only that CMS's approval of the State plan warranted no deference, expressly reserving the statutory-compliance question. *Conn. Primary Care Ass'n v. Wilson-Coker*, 2006 WL 2583083, at *8 (D. Conn. Sept. 5, 2006).

Plaintiffs' theory ultimately rests on a premise § 1396a(bb) will not bear: that a PPS rate—set from a base period that may be decades old and adjusted only for inflation—freezes any later state regulation touching a cost once used to compute it. The expenditures used to set a rate do not bind a clinic forever; it remains free to pursue efficiencies and change operations without rebasing. A Spending Clause condition constrains a State only so far as Congress has spoken unambiguously, *Pennhurst*, 451 U.S. at 17, and nothing in the Medicaid Act unambiguously forbids a State from regulating conduct that bears on a cost once used to set a rate. Were it otherwise, Medicaid

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

reimbursement would immunize an FQHC's entire revenue from generally applicable state taxes, fees, and fines alike—a proposition no court has accepted. At most, Plaintiffs frame a narrow, fact-bound as-applied question at the margins, one that § 7's severability clause would confine in any event. The Medicaid Act identifies no federal command the Initiative transgresses.

**c.      31 U.S.C. § 1301 Does Not Preempt the Initiative.**

Plaintiffs' appropriations theory fails twice over: obstacle preemption cannot apply to Section 1301 at all and, even if it could, the Mission Spend Ratio redirects no appropriation. Section 1301 is a federal fiscal-law command—that "[a]ppropriations shall be applied only to the objects for which the appropriations were made," 31 U.S.C. § 1301(a)—that governs how federal officers spend appropriated funds and is enforced through federal fiscal law, *see* 31 U.S.C. §§ 1341 *et seq.* (Antideficiency Act), not through the Supremacy Clause. It imposes no duty on the States, regulates no State in its regulatory capacity, and announces no federal objective directed at the conduct of private clinics. It therefore supplies no "purpose[] [or] objectiv[e] of Congress," *Hines*, 312 U.S. at 67, for obstacle preemption to apply, and "[t]here is no federal preemption *in vacuo*," *Kansas*, 589 U.S. at 202.

Even if Section 1301 could serve as the basis for obstacle preemption, Plaintiffs' premise is mistaken: the Initiative redirects no appropriation. The appropriation is applied to its object when HHS awards Section 330 funds to support a clinic's delivery of primary care; what the clinic does with its revenue afterward, and what independent state-law obligations attach to it, is not a further application of the appropriation. The Mission Spend Ratio penalty runs against the clinic and is measured by its total revenue, not keyed to, calculated from, or directed at the clinic's federal receipts. The extent to which federal funds are commingled with a clinic's other revenue confirms rather than undermines the point: a general obligation measured by total revenue and payable from whatever funds a clinic has on hand is not a seizure of a particular federal appropriation, and § 1301(a) does not trace appropriated dollars through a recipient's accounts to the obligations it pays—much less into penalties the State later collects and spends. Plaintiffs' emphasis on the eventual legislative use of escrowed penalties (Mot. 19-20) does not change this; the State's later use of penalty receipts is a disposition of state moneys under state law, not a reapplication of a federal appropriation. And the

26

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

penalty's size does not transform its character; § 1301(a) is not a ceiling on what a State may charge an entity that happens to hold a federal grant.

Plaintiffs' authorities confirm the gap rather than close it. *Shepheard* and *Carlsbad*—neither a § 1301 case nor an obstacle-preemption case—struck state formulas that reduced state aid dollar-for-dollar by the federal funds a recipient received, in direct contravention of an express federal directive that the federal money supplement, not supplant, state aid. *Shepheard v. Godwin*, 280 F. Supp. 869, 873-74 (E.D. Va. 1968) (three-judge court); *Carlsbad Union Sch. Dist. v. Rafferty*, 300 F. Supp. 434, 439-40 & n.8 (S.D. Cal. 1969). The Mission Spend Ratio is nothing of the sort: it is keyed to a clinic's total revenue, not federal receipts; it does not reduce any state payment by the federal dollars a clinic obtains; and Plaintiffs identify no anti-offset command of the kind those cases enforced. *Pennsylvania Department of Public Welfare v. Sebelius*, 674 F.3d 139, 144-45 (3d Cir. 2012), confirms the gap from the other direction: it policed a State's diversion of an appropriation it held—the conduct § 1301 governs and the conduct the Initiative does not involve. The appropriations theory identifies no federal command that the Initiative transgresses.

**C.    Plaintiffs Are Not Entitled to a Preliminary Injunction (Rule 65(a)).**

A preliminary injunction is "an extraordinary remedy never awarded as of right." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 24 (2008). Plaintiffs must establish that they are likely to succeed on the merits, that they are likely to suffer irreparable harm absent relief, that the balance of equities tips in their favor, and that an injunction is in the public interest. *Id.* at 20. Irreparable harm must be likely, not merely possible. *Id.* at 22. The Ninth Circuit's "sliding scale" permits a strong showing on one factor to offset a weaker showing on another, but only where the plaintiff raises at least "serious questions going to the merits" and the balance of hardships tips sharply in its favor. *All. for the Wild Rockies v. Cottrell*, 632 F.3d 1127, 1131-35 (9th Cir. 2011). Where, as here, a government officer is the defendant, the balance-of-equities and public-interest factors merge. *California v. Azar*, 911 F.3d 558, 575 (9th Cir. 2018); *Nken v. Holder*, 556 U.S. 418, 435 (2009). And because Plaintiffs ask the Court to alter the conduct of a statewide election, the request implicates the principle that federal courts should not interfere with election administration as the election approaches. *Purcell*, 549 U.S. at 4-5; *Sw. Voter Registration Educ. Project v. Shelley,* 344 F. 3d 914,

918 (9th Cir. 2003) ("a federal court cannot lightly interfere with or enjoin a state election. . . . [t]he decision to enjoin an impending election is so serious that the Supreme Court has allowed elections to go forward even in the face of an undisputed constitutional violation.").

### 1.    Plaintiffs Cannot Show a Likelihood of Success.

Plaintiffs cannot show a likelihood of success on the merits, for the reasons developed above: a movant who has stated no claim, and whose claim fails as a matter of law, cannot show a likelihood of success on it.

### 2.    Plaintiffs Cannot Show Irreparable Harm.

Plaintiffs must show that irreparable harm is likely, not merely possible. *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 22 (2008). That showing is more demanding than the injury-in-fact threshold Plaintiffs have already failed: "[a] plaintiff must do more than merely allege imminent harm sufficient to establish standing; a plaintiff must *demonstrate* immediate threatened injury as a prerequisite to preliminary injunctive relief." *Caribbean Marine Servs. Co. v. Baldrige*, 844 F.2d 668, 674 (9th Cir. 1988) (emphasis in original). Because the harms Plaintiffs assert do not establish even Article III injury, for the reasons set out in Section III.A.1, they cannot establish the greater showing of irreparable harm.

Plaintiffs' reliance on the rule that a likely constitutional violation can itself supply irreparable harm is inapplicable because preemption under the Supremacy Clause is not the kind of violation it protects against. The presumption originates in the deprivation of intangible personal liberties. *See, e.g.*, *Elrod v. Burns*, 427 U.S. 347, 373 (1976) ("The loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury."). A Supremacy Clause preemption claim is not of that character. The Supremacy Clause "is not the source of any federal rights" and supplies only "a rule of decision"; it confers no substantive right whose loss could be presumed irreparable. *Armstrong*, 575 U.S. at 324-25 (citation modified). A private party's injury from an allegedly preempted economic regulation is the cost of compliance—economic and compensable—not the unquantifiable loss *Elrod* addresses. Courts therefore decline to presume irreparable harm where a constitutional claim produces only economic injury, *see Kane v. De Blasio*, 19 F.4th 152, 174 (2d Cir. 2021) (per curiam), and monetary and compliance burdens recoverable in

the ordinary course "are not enough," *Sampson v. Murray*, 415 U.S. 61, 90 (1974). Plaintiffs' own presumption cases prove the distinction: each involved a substantive personal right—the Second Amendment in Baird, equal protection in Associated General Contractors—not the Supremacy Clause. Nor could the Ninth Circuit's sliding scale rescue Plaintiffs if they do not show a likelihood of success, as the lesser "serious questions" track demands that harm be *likely*; the constitutional-violation presumption alone is not enough. *Cottrell*, 632 F.3d at 1135; *Baird*, 81 F.4th at 1040. A plaintiff who invokes the sliding scale because he cannot show likely success cannot simultaneously claim a presumption of irreparable harm that depends on a showing of such a likelihood.

The harms Plaintiffs identify are not irreparable because the Initiative imposes none of them. The contributions Plaintiffs and CPCA's members made to the campaign opposing the measure are voluntary political expenditures, Starr Decl. ¶ 24; Sanchez Decl. ¶ 35. The choice to campaign against a ballot measure is Plaintiffs' own electoral activity, not an injury a court enjoins an election to prevent. The staff time and resources Plaintiffs say they diverted to study and oppose the measure are self-inflicted in the same way and fail for the reasons given in Section III.A.1: a plaintiff cannot manufacture the showing for equitable relief by inflicting costs on itself based on fears of a hypothetical future event. *See Clapper*, 568 U.S. at 402, 416. The penalties Plaintiffs forecast are not present injuries at all: they are contingent on passage and on the measure's later operation, subject to the Attorney General guidance, waiver, escrow, and reimbursement mechanisms described above. *See supra* § III.B.2.a; Init. §§ 12586.3(a)(2), 1234.1(a)(2)-(3). They cannot accrue before each clinic's first full post-passage fiscal year. Init. § 8. Harm that is contingent, self-inflicted, and avoidable through the ordinary course is speculative, not irreparable. *Caribbean Marine*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). Plaintiffs' contrary authorities confirm the point. *East Bay Sanctuary* involved operative law presently restructuring the organizations' daily work and funding, 994 F.3d at 984, whereas this measure is not law and compels nothing now, so the "overhaul" Plaintiffs describe is one they have elected in anticipation. *Rent-A-Center, Inc. v. Canyon Television & Appliance Rental, Inc.*, 944 F.2d 597, 603 (9th Cir. 1991), and *Regents of the University of California v. American Broadcasting Cos.*, 747 F.2d 511, 519-20 (9th Cir. 1984), (Mot. 25) concerned harms flowing from ongoing or imminent

conduct—lost goodwill, an imminent broadcast—not voluntary adjustments to a contingency that may never occur.

The only consequence of denying relief is that the measure appears on the November 2026 ballot rather than being withheld from it, and that is not irreparable. Placement imposes no obligation on any clinic: the measure's standard cannot take effect until each clinic's first full fiscal year beginning at least six months after passage. Init. § 8. Plaintiffs' preemption challenge can therefore be litigated to judgment—and the measure enjoined if it is meritorious—before any clinic must do anything, so the ordinary course can fully redress the asserted injury before it occurs. *Caribbean Marine*, 844 F.2d at 674 ("Speculative injury does not constitute irreparable injury sufficient to warrant granting a preliminary injunction."). Plaintiffs have not carried their burden to show the likely, imminent, irreparable harm an extraordinary remedy requires.

**3.      The Balance of Equities and Public Interest Defeat the Motion.**

Because a state officer is a defendant, the balance-of-equities and public-interest inquiries merge. *See supra* § III.C. Merged, they weigh decisively against the relief Plaintiffs seek, above all because *Purcell* forecloses pre-election interference with the ballot. Plaintiffs ask a federal court to bar the Secretary of State from placing a qualified initiative on the ballot just months before a statewide election, the very intrusion the Supreme Court has instructed federal courts to avoid. *Purcell*, 549 U.S. at 4-5; *see Republican Nat'l Comm. v. Democratic Nat'l Comm.*, 589 U.S. 423, 424 (2020) (per curiam) ("lower federal courts should ordinarily not alter the election rules on the eve of an election"). Striking a qualified measure is at least as disruptive as the voter-rule interventions those cases disapproved. Indeed, by the hearing date the State's initiative calendar will have largely unfolded—certification, the Attorney General's title and summary, the Legislative Analyst's fiscal analysis, the parties' ballot arguments and rebuttals, and a draft Voter Information Guide—and the proponents' withdrawal deadline will have passed. Cal. Elec. Code §§ 9050-9087. Plaintiffs' assurance that an order entered by August 10 would not disrupt ballot printing (Mot. 30-31) mistakes the mechanics for the principle. An order striking a qualified measure does not slot into that calendar; it overrides it. And the asymmetry of error runs one way—an injunction wrongly granted forfeits the November 2026 election irretrievably, while one wrongly denied costs Plaintiffs nothing because the measure imposes

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

no obligation before its deferred effective date and a final judgment of preemption would reach it first. Init., § 8.

The public interest points the same way: it lies in allowing a duly qualified measure to be decided at the polls by the voters, not in having a federal court bar that decision in advance. The initiative power is "one of the most precious rights of our democratic process," which California courts have a solemn duty to "jealously guard." *Associated Home Builders*, 18 Cal. 3d at 591; *Rossi v. Brown*, 9 Cal. 4th 688, 695 (1995). Respect for state election procedures, protection of the proponents' right to use the initiative process, and preservation of orderly election administration all counsel against a federal court serving as a pre-election gatekeeper merely because opponents contend a measure is unlawful; the initiative process is designed to let voters decide such questions in the first instance, subject to judicial review if the measure is enacted. That a federal court "lack[s] competence to rule definitively on the meaning of state legislation," *Arizonans for Official English*, 520 U.S. at 48, only sharpens the point. In this light, the balance of equities points even more strongly against an injunction.

The interests an injunction would extinguish are concrete, not abstract. Removing a qualified measure nullifies the efforts of the proponents, the hundreds of petition circulators, and the more than half a million voters who signed the petition, and deprives voters of the opportunity to enact or reject the measure—injuries California law treats as substantial, recognizing that official proponents are not bystanders but the parties with the direct incentive to defend the people's exercise of initiative power. *See Perry v. Brown*, 52 Cal. 4th 1116, 1126-27, 1149-50 (2011). Petition circulation is itself "core political speech," *Meyer v. Grant*, 486 U.S. 414, 421-23 (1988), and burdening the initiative process reduces the "total quantum of speech" on political change, *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 186-87, 192-95 (1999); *Angle v. Miller*, 673 F.3d 1122, 1132-33 (9th Cir. 2012). The equities thus cannot be measured by Plaintiffs' preference alone; the Court must weigh the injury to the Proponent Defendants, the circulators, the signers, and the voters whose state constitutional initiative rights a pre-election injunction would defeat—an injury that cannot be repaired after Election Day.

---

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

Plaintiffs' own examples confirm the departure they ask the Court to make. They observe (Mot. 31 n.6) that four qualified measures have been removed from California ballots in four decades, but each was removed by the *California* Supreme Court or by the *California* Legislature—Propositions 49 and 24 by the state high court, Propositions 18 and 43 by legislative action—and none by a federal court, much less by a federal injunction directed at a state election officer on preemption grounds. Plaintiffs thus identify no precedent for the relief they request.

The hardships, finally, tip decisively to the proponents. Qualifying a statewide initiative demands an enormous, election-cycle-specific investment—gathering and validating hundreds of thousands of signatures and mounting a campaign organized around a particular election—and an order striking the measure would forfeit the qualified position the proponents and signers earned, defer any vote by a full election cycle, and limit the Proponent Defendants' capacity to pursue other measures in that future cycle. Plaintiffs' countervailing harms are contingent and self-inflicted. Plaintiffs' own reliance on § 9017 (Mot. 27)—that the signatures do not expire and the measure may be resubmitted later—confirms the imbalance rather than dispelling it: a right to re-qualify and re-campaign years later does not restore the sunk investment in this election or the ballot position the injunction would extinguish. A statute permitting later submission measures the floor of the Proponent Defendants' and petition signers' loss; it does not erase it.

**4.        Alternatively, Any Injunction Requires a Substantial Rule 65(c) Bond.**

Should the Court enter a preliminary injunction notwithstanding the foregoing, it may do so "only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). The Proponent Defendants affirmatively request that the Court set a substantial bond and reserve the right to submit evidence of their exposure. The demand is necessary to preserve the protection: although the amount lies within the Court's discretion, a party that neither requests a bond nor offers evidence of its likely damages forfeits the point. *Conn. Gen. Life Ins. Co. v. New Images of Beverly Hills*, 321 F.3d 878, 882 (9th Cir. 2003).

The wrongful-enjoinment exposure here is substantial. For the reasons just described, an injunction would strip the proponents of the qualified ballot position they secured and defer any vote

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION

by at least a full election cycle; the recoverable costs include the multi-million-dollar expense of qualifying a statewide measure and the campaign expenditures already committed to a November 2026 election, the value of which a forced deferral would largely destroy. The proponents request leave to substantiate a specific figure by proffer or declaration should the Court reach the question.

## IV.    CONCLUSION

For the foregoing reasons, the Court should deny Plaintiffs' motion for a preliminary injunction and dismiss the complaint under Rule 12(b)(1) for lack of subject-matter jurisdiction. In the alternative, to the extent the Court reaches the merits, it should dismiss under Rule 12(b)(6) because Plaintiffs have no cause of action and cannot state a preemption claim, and it should deny the injunction because Plaintiffs cannot establish a likelihood of success, irreparable harm, or that the equities and public interest favor the extraordinary relief they seek. Should the Court nonetheless enter an injunction, it should require a substantial bond under Rule 65(c).

DATED: June 17, 2026                  By:     /s/ Darin Ranahan
                                              Catha Worthman
                                              Darin Ranahan
                                              FEINBERG, JACKSON, WORTHMAN
                                              & WASOW LLP
                                              2030 Addison Street, Suite 500
                                              Berkeley, California 94704
                                              Telephone: (510) 269-7998

                                              Bruce Harland, SBN 230477
                                              WEINBERG ROGER & ROSENFELD
                                              1375 55th Street
                                              Emeryville, CA 94608
                                              (510) 337-1001
                                              bharland@unioncounsel.net

Stephen Kaufman, SBN 131605
Gary Winuk, SBN 190313
George Yin, SBN 213910
KAUFMAN LEGAL GROUP, APC
445 S. Figueroa Street
Suite 2400
Los Angeles, CA 90071
(213) 452-6566
skaufman@kaufmanlegalgroup.com
gwinuk@kaufmanlegalgroup.com
gyin@kaufmanlegalgroup.com

***Attorneys for Defendants Service Employees
International Union – United Healthcare Workers
West, Shawna Brown, Sean Fleming***

PROPONENT DEFENDANTS' MOTION TO DISMISS AND OPPOSITION TO PRELIMINARY INJUNCTION