Bruce Harland, SBN 230477
WEINBERG ROGER & ROSENFELD
1375 55th Street
Emeryville, CA 94608
(510) 337-1001
bharland@unioncounsel.net

Catha Worthman, SBN 230399
Darin Ranahan, SBN 273532
FEINBERG, JACKSON, WORTHMAN &
WASOW LLP
2030 Addison Street, Suite 500
Berkeley, CA 94704
(510) 269-7998
catha@feinbergjackson.com
darin@feinbergjackson.com

*Attorneys for Defendants Service Employees
International Union – United Healthcare Workers
West, Shawna Brown, Sean Fleming*

Stephen Kaufman, SBN 131605
Gary Winuk, SBN 190313
George Yin, SBN 213910
KAUFMAN LEGAL GROUP, APC
445 S. Figueroa Street
Suite 2400
Los Angeles, CA 90071
(213) 452-6566
skaufman@kaufmanlegalgroup.com
gwinuk@kaufmanlegalgroup.com
gyin@kaufmanlegalgroup.com

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN FRANCISCO DIVISION

| | |
|---|---|
| CALIFORNIA PRIMARY CARE ASSOCIATION; OPEN DOOR COMMUNITY HEALTH CENTERS, <br><br> *Plaintiffs*, <br><br> vs. <br><br> SHIRLEY N. WEBER, PH.D., in her official capacity as Secretary of State of the State of California; SERVICE EMPLOYEES INTERNATIONAL UNION – UNITED HEALTHCARE WORKERS WEST, as a real-party-in-interest proponent of California Ballot Initiative 25-00008; SHAWNA BROWN, in her capacity as the official proponent of California Ballot Initiative No. 25-00008; and SEAN FLEMING, in his capacity as the official proponent of California Ballot Initiative No. 25-00008, <br><br> *Defendants.* | Case No. 3:26-cv-03837-AGT <br><br> Complaint Filed April 30, 2026 <br><br> **REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS** <br><br> Date:　　July 31, 2026 <br> Time:　　10:00 a.m. <br> Court:　　A, 15th Floor <br> Judge:　　Hon. Alex G. Tse |

# TABLE OF CONTENTS

I.    Introduction ................................................................................................................1

II.   Argument .....................................................................................................................1

    A.    The Court Lacks Subject Matter Jurisdiction Under Rule 12(b)(1) Because Plaintiffs Challenge a Measure That Is Not, and May Never Become, Law. ..........................................1

        1.    The Claims Are Not Ripe Because Any Conflict Depends on Contingent Future Events That May Never Occur. ..................................................1

        2.    Plaintiffs Lack Article III Standing to Challenge a Measure the Electorate Has Not Enacted. ..........................................3

            a.    Plaintiffs' Asserted Injuries Are Not Actual or Imminent, but Voluntary, Anticipatory, and Contingent. ..........................................3

            b.    Plaintiffs' Purported Injuries Are Not Fairly Traceable to These Defendants, nor Are They Redressable by the Requested Relief. ..........................................5

            c.    CPCA Has No Standing in Its Own Right or on Behalf of Its Members. ................6

    B.    Plaintiffs Fail to State a Claim Because They Assert No Valid Cause of Action and Cannot Show the Initiative Is Preempted in Every Application (Rule 12(b)(6)). ...............................7

        1.    The Equitable Preemption Action *Armstrong* Preserved Has No Role Where There Is No Enacted State Regulation to Enjoin. ..........................................7

        2.    Even If They Had Stated a Recognized Cause of Action, Plaintiffs' Preemption Theories Fail. ..........................................8

            a.    Plaintiffs Must Show the Initiative Invalid in Every Application Under Binding Ninth Circuit Authority Continuing to Apply *Salerno*. ..........................................8

            b.    The Conflict-Avoidance Mechanisms Confirm the Initiative Has a Wide Field of Lawful Applications. ..........................................9

            c.    Section 330 of the Public Health Service Act Does Not Preempt the Initiative. ....11

            d.    Section 1396a(bb) Governs What the State Pays, Not How a Clinic Spends What It Receives. ..........................................13

            e.    The General Appropriations Law (31 U.S.C. § 1301) Supplies No Command the Initiative Transgresses. ..........................................15

III.  Conclusion ..........................................................................................................15

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS

# TABLE OF AUTHORITIES

**Cases**

Armstrong v. Exceptional Child Ctr., Inc., 575 U.S. 320 (2015) ...................................................1, 7, 8

Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity, 950 F.2d 1401 (9th Cir. 1991) 3, 5

Babbitt v. United Farm Workers Nat'l Union, 442 U.S. 289 (1979) .....................................................3, 5

Buscemi v. Bell, 964 F.3d 252 (4th Cir. 2020)...........................................................................................5

California Ass'n of Rural Health Clinics v. Douglas, 738 F.3d 1007 (9th Cir. 2013) ..........................14

California v. Texas, 593 U.S. 659 (2021) ...................................................................................................6

Carlsbad Union Sch. Dist. v. Rafferty, 300 F. Supp. 434 (S.D. Cal. 1969)...........................................15

Chase Brexton Health Servs., Inc. v. Maryland Dep't of Health & Mental Hygiene, No. MJG-03-1548, 2006 WL 6593814 (D. Md. Dec. 15, 2006).........................................................................14

City of Chicago v. Morales, 527 U.S. 41 (1999) .......................................................................................9

City of Los Angeles v. Lyons, 461 U.S. 95 (1983) ....................................................................................6

City of Reno v. Netflix, Inc., 52 F.4th 874 (9th Cir. 2022) .......................................................................8

Clapper v. Amnesty Int'l USA, 568 U.S. 398 (2013).............................................................................4, 5

Cmty. Health Ctr., Inc. v. Wilson-Coker, 311 F.3d 132 (2d Cir. 2002) .................................................14

Costa v. Super. Ct., 37 Cal. 4th 986 (2006) ..............................................................................................2

Crosby v. Nat'l Foreign Trade Council, 530 U.S. 363 (2000) ...............................................................12

Diaz v. Bd. of County Comm'rs, 502 F. Supp. 190 (S.D. Fla. 1980).........................................................2

Dyna-Med, Inc. v. Fair Emp't & Hous. Comm'n, 43 Cal. 3d 1379 (1987)...............................................4

Evangelatos v. Super. Ct., 44 Cal. 3d 1188 (1988)...................................................................................5

Ex parte Young, 209 U.S. 123 (1908) .......................................................................................................7

FDA v. Alliance for Hippocratic Medicine, 602 U.S. 367 (2024).............................................................6

Gonzaga Univ. v. Doe, 536 U.S. 273 (2002).............................................................................................8

Havens Realty Corp. v. Coleman, 455 U.S. 363 (1982)............................................................................6

Health & Hosp. Corp. of Marion Cnty. v. Talevski, 599 U.S. 166 (2023)...............................................8

Hines v. Davidowitz, 312 U.S. 52 (1941).................................................................................................12

Home for the Aged of the Little Sisters of the Poor v. McDonald, 711 F. Supp. 3d 81 (N.D.N.Y. 2024) .................................................................................................................................................11

Hunt v. Wash. State Apple Advertising Comm'n, 432 U.S. 333 (1977)..............................6

Immigrant Defenders Law Center v. Noem, 145 F.4th 972 (9th Cir. 2025) .........................6

Kansas v. Garcia, 589 U.S. 191 (2020).............................................................................11

Loper Bright Enters. v. Raimondo, 603 U.S. 369 (2024) ...................................................14

Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992) ..........................................................3

MedImmune, Inc. v. Genentech, Inc., 549 U.S. 118 (2007)..................................................3

Medina v. Planned Parenthood S. Atl., 606 U.S. 357 (2025) ...............................................8

Mendia v. Garcia, 768 F.3d 1009 (9th Cir. 2014).................................................................5

Morgan Hill Concerned Parents Ass'n v. Cal. Dep't of Educ., 258 F. Supp. 3d 1114 (E.D. Cal. 2017) .7

Mut. Pharm. Co. v. Bartlett, 570 U.S. 472 (2013) ..............................................................11

Nev. Rest. Ass'n v. PEST Comm., 2008 WL 8225546 (D. Nev. July 15, 2008) ...................2

Pa. Dep't of Pub. Welfare v. Sebelius, 674 F.3d 139 (3d Cir. 2012) ..................................15

Pennhurst State Sch. & Hosp. v. Halderman, 451 U.S. 1 (1981) ........................................11

Puente Arizona v. Arpaio, 821 F.3d 1098 (9th Cir. 2016).....................................................8

Ranjel v. City of Lansing, 417 F.2d 321 (6th Cir. 1969).......................................................2

Rice v. Santa Fe Elevator Corp., 331 U.S. 218 (1947).......................................................12

Rinnai America Corp. v. S. Coast Air Quality Mgt. Dist., 2026 WL 1912093 (9th Cir. July 2, 2026) ..9

Shepheard v. Godwin, 280 F. Supp. 869 (E.D. Va. 1968)...................................................15

Steel Co. v. Citizens for a Better Env't, 523 U.S. 83 (1998) ................................................6

Susan B. Anthony List v. Driehaus, 573 U.S. 149 (2014) ....................................................3

Texas v. United States, 523 U.S. 296 (1998).......................................................................2

Trump v. New York, 592 U.S. 125 (2020) ............................................................................4

United States v. Salerno, 481 U.S. 739 (1987) ...........................................................1, 8, 15

Valle Del Sol Inc. v. Whiting, 732 F.3d 1006 (9th Cir. 2013) ..............................................3

Wash. State Grange v. Wash. State Republican Party, 552 U.S. 442 (2008) ...................9, 10

Wyeth v. Levine, 555 U.S. 555, 565 (2009) ...................................................................10, 12

**Statutes**

20 U.S.C. § 1415(b)(6) .......................................................................................................7

31 U.S.C. § 1301 ................................................................................................................8, 15

31 U.S.C. §§ 1341 et seq. (Antideficiency Act) ...............................................................8, 15

42 U.S.C. § 1396a(bb) ...............................................................................................8, 13, 14

42 U.S.C. § 1396c .....................................................................................................................7, 8

42 U.S.C. § 254b...............................................................................................................passim

**Rules**

Fed. R. Civ. P. 12(b)(1)......................................................................................................1, 15

Fed. R. Civ. P. 12(b)(6)..................................................................................................1, 7, 15

**Regulations**

2 C.F.R. § 200.340 ..................................................................................................................13

2 C.F.R. § 200.414(f) .............................................................................................................13

2 C.F.R. § 200.441 .................................................................................................................13

**Constitutional Provisions**

U.S. Const. art. VI, cl. 2..................................................................................................1, 7, 15

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS

## I.    INTRODUCTION

Plaintiffs ask this Court to do something that, apparently, no federal court has ever done: strike a duly qualified California initiative from the ballot, and to do so on the basis of causes of action that do not exist. The attempt fails under both Rule 12(b)(1) and Rule 12(b)(6), and neither is a close call. The pre-election challenge is simply not ripe, and there is no imminent injury in fact given that the measure has not been passed by voters, has not been interpreted by the Attorney General, and cannot, by its terms, be enforced against anyone until 2028 at the earliest.

Even if the Court does determine that Plaintiffs have established jurisdiction, their claims still fail. In *Armstrong*, the Supreme Court held that the Supremacy Clause creates no right of action. Plaintiffs concede that rule. But their three preemption counts rely on the Supremacy Clause alone, and their declaratory relief claim is admittedly derivative of those claims. Nor could Plaintiffs rely on the equitable cause of action preserved in *Armstrong* even if they had pleaded it. That doctrine permits a party subject to an operative state law to seek an injunction to prevent that law's enforcement. But here there is no enacted regulation to enjoin and no enforcement to stop.

Finally, if the Court were to reach the merits, Plaintiffs fall far short of the demanding facial standard their own authorities require. Under binding Ninth Circuit authority, a non-First Amendment facial preemption challenge fails unless the measure is invalid in every application; *Salerno* remains controlling in that context. None of the three statutes they invoke preempt the challenged measure in every application.

## II.    ARGUMENT

**A.    The Court Lacks Subject Matter Jurisdiction Under Rule 12(b)(1) Because Plaintiffs Challenge a Measure That Is Not, and May Never Become, Law.**

Plaintiffs fail to carry their burden of showing standing and ripeness, because the Initiative has not been enacted, may never take effect, and imposes no present obligations or penalties.

**1.    The Claims Are Not Ripe Because Any Conflict Depends on Contingent Future Events That May Never Occur.**

Plaintiffs' opposition never engages the federal ripeness framework. Their only answer is state pre-election-review doctrine, but those cases do not help them with ripeness for purposes of federal

court jurisdiction and, in any event, do not even support pre-election review on their own terms here. In short, whether the Initiative as actually construed and administered would conflict with federal law turns on events that "may not occur as anticipated, or indeed may not occur at all": the electorate must adopt the measure, the Attorney General must have the opportunity to issue binding guidance, and the Attorney General and Department of Public Health must actually administer the law—none of which have occurred. *Texas v. United States*, 523 U.S. 296, 300-01 (1998) (citation omitted). Until then there is no construction to test, and an antecedent, contested question of state-law construction committed to a state official who has not acted is the antithesis of a controversy fit for review. Nor is there hardship. Even assuming the Initiative will pass, no obligation will bind any clinic until at least six months after an election that has not occurred. Initiative § 8. And the compliance-planning costs Plaintiffs invoke are the same voluntary, anticipatory outlays that fail to establish injury, as discussed below. Because nothing requires any clinic to act or refrain now, withholding review works no hardship. *Texas*, 523 U.S. at 301.

Federal courts decline jurisdiction over pre-enactment challenges to ballot initiatives for precisely this reason. *See, e.g.*, *Nev. Rest. Ass'n v. PEST Comm.*, 2008 WL 8225546, at *2-3 (D. Nev. July 15, 2008) (challenge to a proposed initiative unfit for review because it depended on "a condition the satisfaction of which is wholly uncertain"—passage by the voters—and no hardship arose because the challenge could be brought after enactment); *Ranjel v. City of Lansing*, 417 F.2d 321, 325 (6th Cir. 1969); *Diaz v. Bd. of County Comm'rs*, 502 F. Supp. 190, 193 (S.D. Fla. 1980). Plaintiffs have identified *no* federal court decision upholding a pre-election challenge to a state ballot initiative.

While Plaintiffs cite limited exceptions where *California* courts have granted pre-election review of ballot initiatives, none of those exceptions apply in the Article III context. *See Nev. Rest. Ass'n*, 2008 WL 8225546, at *4 (distinguishing state courts that have granted pre-election review because state courts "are not subject to the constitutional and prudential jurisdictional restrictions surrounding Article III"). Even if they did apply, Plaintiffs consistently ignore or downplay the fact that California courts reject substantive pre-election review in all but the narrowest of circumstances, on a "clear showing of invalidity," which Plaintiffs cannot show in any event. *See Costa v. Super. Ct.*, 37 Cal. 4th 986, 1005-07 (2006) (citations omitted).

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS

**2.    Plaintiffs Lack Article III Standing to Challenge a Measure the Electorate Has Not Enacted.**

Not only have Plaintiffs failed to demonstrate ripeness, but they also fail to meet the elements of Article III standing: an injury-in-fact, fairly traceable to Defendants' challenged conduct, and likely to be redressed by a favorable decision. *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992). They cannot make this showing because of the fundamental fact that, until the electorate acts, no officer has authority to apply the Initiative and no clinic has any obligation under it.

**a.    Plaintiffs' Asserted Injuries Are Not Actual or Imminent, but Voluntary, Anticipatory, and Contingent.**

An injury in fact must be "actual or imminent, not conjectural or hypothetical." *Lujan*, 504 U.S. at 560. Plaintiffs' asserted injuries are neither actual nor imminent. They are not imminent because the Initiative is not law and its enactment is itself a contingent future event. They are not actual because the only steps taken to date are ones Plaintiffs have chosen to take in anticipation of an unapproved measure that currently binds no one. Nothing in the opposition closes either gap. Plaintiffs' rejoinder that it is "of no moment" the Initiative has not passed rests on state pre-election-review cases that do not speak to Article III justiciability and would not support Plaintiffs even if applicable, as explained in Section II.A.1. *See* Pls.' Consol. Br. 4, Dkt. No. 40 ("Pls.' Opp'n").

First, the harm is not imminent. Plaintiffs' own federal pre-enforcement authorities each presuppose an enacted, operative statute, contract, or other governing document whose enforcement was threatened. *See Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 151 (2014) (existing false-statement statute); *MedImmune, Inc. v. Genentech, Inc.*, 549 U.S. 118, 121-22 (2007) (existing license and patent); *Valle Del Sol Inc. v. Whiting*, 732 F.3d 1006, 1015 (9th Cir. 2013) (existing statute); *Associated Gen. Contractors of Cal., Inc. v. Coal. for Econ. Equity*, 950 F.2d 1401, 1403-04 (9th Cir. 1991) (existing ordinance); *cf. Babbitt v. United Farm Workers Nat'l Union*, 442 U.S. 289, 298 (1979) (injury measured "as a result of [a] statute's operation or enforcement"). There is no statute here: Initiative 25-0008A1 will not be voted on until November 3, 2026, and may never become law. Because enactment is itself a future contingency, Plaintiffs' asserted harm "relies on a highly attenuated chain of possibilities" and is not "certainly impending." *Clapper v. Amnesty Int'l USA*, 568

U.S. 398, 410 (2013). The "chain of possibilities" runs from enactment, to Attorney General guidance, to denial of any waiver, to failure of the escrow-and-refund mechanism—every link unrealized.

Plaintiffs' attempts to supply the missing certainty fail. They first misread *Clapper* as a case about prosecutorial discretion alone, arguing that no third party stands between the Initiative and clinics because the measure "expressly targets" them and penalties are "virtually certain." Pls.' Opp'n 3. But *Clapper* rejected exactly that theory: a threatened injury must be "certainly impending," and "[a]llegations of possible future injury are not sufficient," however confidently the probability is stated. 568 U.S. at 409-10. And that a law is aimed at the plaintiff does not make injury imminent. In *Trump v. New York*, the plaintiffs were the policy's plain objects, yet the Court found no justiciable injury because the case was "riddled with contingencies and speculation." 592 U.S. 125, 131 (2020) (per curiam) (citation modified). Meanwhile, Plaintiffs dismiss the Initiative's waiver and binding-guidance mechanisms as mere "speculation." Pls.' Opp'n 3:21-4:4. But the burden is theirs, and whether the Initiative ever yields a penalty turns on how the Attorney General's guidance, the Department of Public Health's waiver process, and the escrow-and-refund mechanism are administered. Courts are "reluctant to endorse standing theories that require guesswork as to how independent decisionmakers will exercise their judgment," *Clapper*, 568 U.S. at 413, yet Plaintiffs' projection assumes every discretionary question will be resolved against every clinic.

Plaintiffs' fallback—that penalties follow automatically upon passage because the Mission Spend Ratio is computed on already-reported 2024 data, Pls.' Opp'n 3—rests on a truncated quotation. They quote the numerator of the Mission Spend Ratio as drawn "from line 4e of Part III of each clinic's Form 990 as of calendar year 2024," but omit the words tying the figure to "such successor portion of clinics' tax reporting." Initiative § 3 (proposed Cal. Gov't Code § 12586.3(b)(1)(A)) (RJN, Ex. 1, Dkt. No. 28-1). Read in context, the citation to line 4e is to a *location on the form*—line 4e as it exists on the 2024 Form 990, or its successor line if the IRS reorganizes the form—not a frozen year of data. A closed year has no "successor portion," only a form does. Reading the clause otherwise violates the rule that every word be given meaning. *Dyna-Med, Inc. v. Fair Emp't & Hous. Comm'n*, 43 Cal. 3d 1379, 1386-87 (1987). Section 8 confirms it: the 90-percent requirement "appl[ies] to each clinic's first full fiscal year beginning at least 6 months after passage," Initiative §

8, so it measures spending in that future year. Initiatives apply prospectively absent "clearly expressed contrary intent," and none is expressed here. *Evangelatos v. Super. Ct.*, 44 Cal. 3d 1188, 1218 (1988). Even if enacted, then, the Initiative would impose no automatic penalty.

Second, the harm is not actual. The concrete "injuries" Plaintiffs identify—"diversion of resources and money, disruption of capital improvement projects, interruptions to staffing increases and recruitment," Pls.' Opp'n 23—are steps clinics have chosen to take in anticipation of potential passage of the Initiative. For purposes of this facial attack under Rule 12(b)(1), Defendants do not dispute that some clinics may have taken them. The question is whether voluntary steps create Article III injury. They do not. A plaintiff "cannot manufacture standing merely by inflicting harm on [itself] based on [its] fears of hypothetical future harm that is not certainly impending." *Clapper*, 568 U.S. at 416. Steps taken in anticipation of a measure that is not law are the paradigm of self-inflicted injury. Standing existed in *Associated General Contractors* only because the ordinance was in effect and application of the ordinance was "compulsory in nature," 950 F.2d at 1407, the opposite of an initiative that binds no one until the electorate enacts it and even then leaves significant room for discretion in enforcement. And, *Buscemi* supports Defendants: its "terms of the statute" formulation presupposes an operative statute, and the Fourth Circuit affirmed dismissal of the ballot-access claims for lack of standing. *Buscemi v. Bell*, 964 F.3d 252, 259-60 (4th Cir. 2020).

### b. Plaintiffs' Purported Injuries Are Not Fairly Traceable to These Defendants, nor Are They Redressable by the Requested Relief.

Plaintiffs do not directly address the traceability analysis raised in the Proponent Defendants' opening brief. *Compare* Proponent Defs.' Mot. 8:17-9:3, Dkt. No. 32 ("Proponents' Mot."), *with* Pls.' Opp'n 2-5 (bare assertion of traceability; the only argument is an aside in a parenthetical for *Mendia v. Garcia*, 768 F.3d 1009 (9th Cir. 2014)). The one traceability authority they do cite, *Mendia*, is distinguishable because it involved an existing regime, not one that has yet to be enacted. Accordingly, they fail to meet their burden to demonstrate traceability for the reasons previously set forth.

Redressability also fails because the injuries to date Plaintiffs actually describe—resources already diverted and campaign funds already committed—are by their own account sunk costs, and

prospective relief cannot restore a dollar already spent. Relief that leaves the injury where it stands "cannot bootstrap a plaintiff into federal court." *Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 107 (1998); *see City of Los Angeles v. Lyons*, 461 U.S. 95, 102, 105 (1983) (past exposure supports no prospective relief absent continuing adverse effects). To the extent Plaintiffs cast their injury as future spending against or to prepare for the Initiative, or future penalties should it pass, the spending is optional and the penalties are contingent on the electorate's future choice and state officials' future implementation—neither redressable now nor certainly impending, for the reasons already given. Where a provision cannot yet be enforced, "[t]here is no one, and nothing, to enjoin," and adjudicating its validity "would allow a federal court to issue . . . an advisory opinion without the possibility of any judicial relief." *California v. Texas*, 593 U.S. 659, 673 (2021).

### c.    CPCA Has No Standing in Its Own Right or on Behalf of Its Members.

Separate and apart from the above jurisdictional defects, CPCA cannot establish organizational or associational standing. *Havens* involved an operative practice already impairing the organization's existing services, and *Alliance* requires a concrete impairment of organizational activities, not resources spent studying, preparing for, or advocating about a possible future law. *See Havens Realty Corp. v. Coleman*, 455 U.S. 363, 379 (1982); *FDA v. Alliance for Hippocratic Medicine*, 602 U.S. 367, 394-95 (2024). *Immigrant Defenders Law Center v. Noem*, the sole additional case Plaintiffs cite, confirms the same point: organizational standing existed only where the policy was already in force and was already disrupting the organization's baseline work. *See* 145 F.4th 972, 988 (9th Cir. 2025). Here, the Initiative creates no obligation, compliance regime, or enforcement barrier unless and until the electorate enacts it. CPCA's claimed expenditures to help members "understand, prepare for, and navigate" the Initiative are therefore self-inflicted costs of anticipating a contingent future problem, not a present impairment of its § 254b(l) technical-assistance work. Accepting that theory would allow any trade association to manufacture standing by spending money to analyze or oppose a pending ballot measure. CPCA's associational standing theory adds nothing because it is derivative, and no member has shown an actual or imminent, non-self-inflicted injury. *See Hunt v. Wash. State Apple Advertising Comm'n*, 432 U.S. 333, 343 (1977).

**B.      Plaintiffs Fail to State a Claim Because They Assert No Valid Cause of Action and Cannot Show the Initiative Is Preempted in Every Application (Rule 12(b)(6)).**

Even if the Court reaches the merits, the complaint fails twice over: Plaintiffs pleaded no valid cause of action and, even if they had, their preemption theories fail regardless.

**1.      The Equitable Preemption Action *Armstrong* Preserved Has No Role Where There Is No Enacted State Regulation to Enjoin.**

Plaintiffs do not dispute the threshold defect: they concede *Armstrong* "rejected the notion that the Supremacy Clause itself supplies an implied right of action." Pls.' Opp'n 12. Yet, their complaint relies solely on the Supremacy Clause for its first three causes of action. *See* Compl. at 28:1-31:21, Dkt. No. 1. This disposes of the pleaded claims.

Attempting to salvage this oversight, they rest instead on the equitable tradition *Armstrong* described—the "long recognized" power to enjoin state officers where "an individual claims federal law immunizes him from state regulation." Pls.' Opp'n 12 (quoting *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 326 (2015)); *see Ex parte Young*, 209 U.S. 123, 155-56 (1908). But that tradition does not rescue a complaint that pleaded only Supremacy Clause counts. In any event, the action *Armstrong* described presupposes a "state regulation" to be immunized from and a "state regulatory action[]" to be enjoined. *Armstrong*, 575 U.S. at 326. There is neither. Plaintiffs treat an unenacted measure as operative law and recast the Secretary of State's ministerial act of printing a ballot as "enforcement"—though the Secretary enforces nothing against them. Plaintiffs' lone authority, *Morgan Hill Concerned Parents Association v. California Department of Education*, allowed suit to proceed for one reason: "[u]nlike in . . . *Armstrong*, the plaintiffs . . . rel[ied] on a provision of the IDEA that creates a [federal] private right of action." 258 F. Supp. 3d 1114, 1127 (E.D. Cal. 2017) (citing 20 U.S.C. § 1415(b)(6)). None of the statutes Plaintiffs invoke contain an analogue to § 1415(b)(6)—there is no private right of action, express or implied.

The structural features that foreclosed equitable enforcement in *Armstrong* are equally present here. *Armstrong* found Congress's "intent to foreclose" equitable relief in two aspects of the Medicaid provision at issue there: a single specified enforcement method—the withholding of funds under § 1396c—and text that was "judicially unadministrable." 575 U.S. at 328. Both are true here: Congress

committed enforcement of Section 330 to HHS through the grant-administration apparatus, enforcement of § 1396a(bb) runs through the very § 1396c withholding remedy *Armstrong* held to be exclusive, and § 1301 is enforced through agency disallowance and the Antideficiency Act, not private suits. And the standard Plaintiffs would have courts enforce—whether a state spending rule obstructs the purposes of a federal grant program—is at least as "judicially unadministrable" as the judgment-laden payment standard in *Armstrong*. Moreover, the settled rule for Spending Clause statutes applies: conditions on federal funds create no privately enforceable rights absent "clear and unambiguous" rights-creating language. *See, e.g.*, *Gonzaga Univ. v. Doe*, 536 U.S. 273, 290 (2002); *Health & Hosp. Corp. of Marion Cnty. v. Talevski*, 599 U.S. 166, 183 (2023); *Medina v. Planned Parenthood S. Atl.*, 606 U.S. 357, 366 (2025).

Plaintiffs' fourth cause of action, for declaratory relief, fails with the rest: the Declaratory Judgment Act "does not provide an affirmative cause of action where none otherwise exists." *City of Reno v. Netflix, Inc.*, 52 F.4th 874, 878 (9th Cir. 2022). Plaintiffs concede that their Declaratory Judgment Act claim is derivative of their Supremacy Clause claims, *see* Pls.' Opp'n 13.

### 2. Even If They Had Stated a Recognized Cause of Action, Plaintiffs' Preemption Theories Fail.

Plaintiffs bring a facial challenge and must show the Initiative invalid in every application. They cannot: the measure is built to be administered in harmony with federal programs, and none of the three statutes they invoke—Section 330, Section 1396a(bb), or the general appropriations law—supplies the conflict a facial preemption challenge requires.

#### a. Plaintiffs Must Show the Initiative Invalid in Every Application Under Binding Ninth Circuit Authority Continuing to Apply *Salerno*.

Plaintiffs bring a facial, pre-enforcement challenge. Accordingly, they must show that "no set of circumstances exists under which the Act would be valid." *United States v. Salerno*, 481 U.S. 739, 745 (1987). Anticipating this burden, Plaintiffs suggest that *Salerno* has been diminished and that a lesser showing suffices. Pls.' Opp'n 14. It has not, and it does not. The Ninth Circuit confirmed in *Puente Arizona v. Arpaio* that *Salerno* continues to govern facial preemption challenges outside the First Amendment context. 821 F.3d 1098, 1104 (9th Cir. 2016). It reaffirmed that conclusion earlier

this month. *See Rinnai America Corp. v. S. Coast Air Quality Mgt. Dist.*, --- F.4th ---, 2026 WL 1912093, at \*12 (9th Cir. July 2, 2026). That is binding here. Plaintiffs lean on a footnote from *City of Chicago v. Morales* calling the *Salerno* formulation one that "has never been the decisive factor in any decision of this Court," 527 U.S. 41, 55 n.22 (1999)—but *Morales* predates *Puente Arizona* and *Rinnai*, and the footnote is an aside from a three-Justice plurality the concurrences declined to join and the dissent rejected, not a holding.

Plaintiffs fare no better under the alternative "plainly legitimate sweep" test from the First Amendment context. Under this test, "a law may be overturned as impermissibly overbroad because a substantial number of its applications are unconstitutional, judged in relation to the statute's plainly legitimate sweep." *Wash. State Grange v. Wash. State Republican Party*, 552 U.S. 442, 449 n.6 (2008) (citation modified). *Washington State Grange* rejected a facial, pre-enforcement challenge to an approved initiative that the State had not yet administered, holding it valid "under either standard," in part because the challengers' theory rested on "sheer speculation" about future behavior. *Id.* at 449, 454-55. So too, here, indeed more so: the Initiative has not been passed let alone enforced, and thus— despite their argument that calamity will ensue should it pass—Plaintiffs can do no more than speculate how voters will decide on the Initiative and how the Initiative would be enforced if passed.

### b.    The Conflict-Avoidance Mechanisms Confirm the Initiative Has a Wide Field of Lawful Applications.

The Initiative's text defeats any argument that no set of circumstances yields a valid application because it is built to be administered in harmony with federal programs. The numerator and denominator of the Mission Spend Ratio (exempt purpose spending and total revenue, respectively) are not fixed to any line of the Form 990, but rather those lines represent starting points. The Attorney General is "authorized to issue binding guidance on how to report these two figures" and is expressly empowered to credit exempt-purpose spending not captured on Form 990 line 4e. Init. § 3 (proposed Cal. Gov't Code § 12586.3(b)(2)). That certain services Plaintiffs describe— outreach, interpretation, case management, care coordination—are integral to the health-center model confirms the point. These types of services are the kinds of exempt-purpose spending the Mission

Spend Ratio numerator is built to capture, either immediately—to the extent the services may already properly be captured on line 4e—or following Attorney General guidance.

A clinic that cannot meet the ratio is not automatically penalized: the Department of Public Health may grant a waiver—a "temporary pause of the 90 percent requirement or . . . an alternative mission spend ratio requirement"—"on the basis of unexpected or exceptional circumstances or the clinic's economic condition." Init. § 4 (proposed Cal. Health & Safety Code § 1234.1(c)). And any penalty is held in escrow for five years and reimbursed to a clinic that comes into compliance and agrees on a spending plan. *Id.* (proposed Cal. Health & Safety Code § 1234.1(a)(2)-(3)).

Plaintiffs do not dispute that these mechanisms exist. They argue that the Attorney General's adjustment authority is cabined by the measure's stated intent to prioritize "mission-directed spending . . . over management and overhead," Pls.' Opp'n 14, 18 (quoting Init. §§ 2(h), 3 [proposed Cal. Gov't Code § 12586.3(b)(2)(B)]), so that conforming guidance is foreclosed. However, the operative text specifically lets the Attorney General credit expenditures that are not Form 990 program-service expenses if it determines them to be "spent on the clinic's exempt purpose," Init. § 3 (proposed Cal. Gov't Code § 12586.3(b)(2)(A)(iii))—and a clinic's exempt purpose is the delivery of charitable health-center services, precisely what Section 330 and the Medicaid Act fund. Plaintiffs' contrary reading assumes the most preemption-prone construction of an authority the Attorney General has not yet construed, which a facial challenge may not do. *Grange*, 552 U.S. at 450.

Recognizing that the mechanisms give the measure lawful applications, Plaintiffs retreat to a theory that the defect "inheres in the Initiative's grant of enforcement authority itself," so that even guidance fully conforming to federal law would be preempted because the State has "inserted itself" into federal processes. Pls.' Opp'n 19. If a State's assertion of authority affecting federally funded health center spending were preempted per se—regardless of how the authority is exercised—then every state regulation reaching federally qualified health centers would be facially void the day it passed. That result cannot be squared with the presumption against preemption that governs in fields of traditional state concern, including medical facilities, charitable corporations, and the State's own healthcare safety net. *Wyeth v. Levine*, 555 U.S. 555, 565 (2009). Plaintiffs' own framing confirms the overreach: they say a conflict would persist "even if the Attorney General simply adopted federal

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS

authorities in its guidance," Pls.' Opp'n 18–19—but preemption that survives the elimination of any actual conflict is field preemption, not conflict preemption, and such an unpleaded field-preemption theory cannot be sustained in an area of traditional state concern.

Plaintiffs' theory also cannot be squared with the one court to address a materially identical regime. *Home for the Aged of the Little Sisters of the Poor v. McDonald* dismissed preemption challenges to a New York statute requiring residential health-care facilities to spend minimum percentages of revenue on direct care and staffing, and capping profit. 711 F. Supp. 3d 81, 90, 96-97, 108-09 (N.D.N.Y. 2024). Rejecting the same theories Plaintiffs raise, the court applied the presumption against preemption, found dual compliance possible, and reasoned that once a facility "accepted a payment . . . that sum would cease to be a 'Federal fund,' and there would exist no violation of 42 C.F.R. § 433.51." *Id.* at 109 n.20. A revenue-measured minimum-spend standard for federally funded health facilities, as the Initiative would, is thus not facially preempted.

### c.    Section 330 of the Public Health Service Act Does Not Preempt the Initiative.

Plaintiffs' § 330 argument fails under each form of conflict preemption they invoke. As a threshold matter, the federal materials Plaintiffs marshal are not preemptive federal law. Grant terms, HRSA program requirements, and the Uniform Guidance cost principles are Spending Clause conditions that bind the grantee "much in the nature of a contract," *Pennhurst State Sch. & Hosp. v. Halderman*, 451 U.S. 1, 17 (1981), and do not radiate outward to preempt generally applicable state law reaching a clinic's total revenue. As the Supreme Court has held, "[t]here is no federal preemption in vacuo," and the Supremacy Clause "gives priority to 'the Laws of the United States,' not the . . . priorities or preferences of federal officers." *Kansas v. Garcia*, 589 U.S. 191, 202, 212 (2020) (citation modified). Plaintiffs' premise that HHS's "plenary" control over clinic budgets displaces any state standard thus fails before the conflict analysis begins. And even indulging that premise, conflict preemption is not present.

First, impossibility requires that it be "impossible for a private party to comply with both state and federal requirements," not merely that compliance be costlier or less convenient. *Mut. Pharm. Co. v. Bartlett*, 570 U.S. 472, 480 (2013) (citation modified). A clinic can devote at least ninety percent of

its total revenue to program services *and* satisfy every condition Section 330 imposes because the two govern different things: Section 330 governs what a grantee may charge to its federal award, while the Initiative sets a standard for how a clinic allocates its total revenue. Even if they governed the same subject, Plaintiffs effectively concede that dual compliance is possible by noting that, even under their aggressive misreading of the Initiative, up to 10% of clinics were already in compliance. *See* Pls.' Opp'n 2:22-26; *see also* Hamm Decl. ¶ 14, Dkt. No. 28-2; *id.* Ex. A at 5-7 (9% of clinics already in compliance based on previous Form 990s). Because both Section 330 and the Initiative can be obeyed together, impossibility "does not arise." *Wyeth*, 555 U.S. at 573 (citation modified). At most, Plaintiffs show that simultaneous compliance may be costly for some clinic in some year—an as-applied concern that cannot establish invalidity "in all . . . applications," as a facial challenge requires. *Grange*, 552 U.S. at 449.

Nor does the Initiative stand as an obstacle to Section 330. A state law is preempted on this ground only where it "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress," *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941)—a question "informed by examining the federal statute as a whole and identifying its purpose and intended effects," *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000). Because the Initiative operates in an area of traditional state concern—the use of charitable assets by nonprofit health facilities—the Court must "start with the assumption that the historic police powers of the States were not to be superseded . . . unless that was the clear and manifest purpose of Congress." *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947); *see Wyeth*, 555 U.S. at 565. Section 330's object is to fund and sustain health centers that furnish primary care to medically underserved communities. *See* 42 U.S.C. § 254b. A measure directing that clinic revenue be spent predominantly on direct patient care and mission-related services advances that objective; it does not obstruct it. And Section 330 embodies no countervailing congressional purpose—no federal objective to preserve clinic overhead or administrative spending against a State's generally applicable allocation standard—that the Initiative could frustrate.

Plaintiffs' specific cost-rule citations identify no such purpose; each governs the grantee-agency accounting relationship, not the State. Plaintiffs' treatment of the de minimis indirect-cost rate

illustrates their conflation of the two. Plaintiffs treat 2 C.F.R. § 200.414(f) as though it requires clinics to incur up to fifteen percent in overhead that the Initiative then forbids. *See* Pls.' Opp'n 18:14-21. The rate is permissive: a recipient without a negotiated rate "may elect" it and is "not required to use" it. 2 C.F.R. § 200.414(f). The rate is thus an optional ceiling on unnegotiated indirect-cost recovery between a clinic and its funding agency, not a floor on what a clinic must spend. Nothing in it commands that more than ten percent of total clinic revenue be spent on overhead that does not count as exempt-purpose spending under the Initiative. Plaintiffs' remaining citations are the same in character. Section 200.441 makes costs of "violations of . . . [State] laws" unallowable "except when incurred as a result of compliance with . . . the Federal award"—a cost-allocation rule that presupposes a valid state obligation enforceable against the grantee's other revenues, not a bar to paying a state penalty. Sections 200.308, 200.339, and 200.340 govern only budget approvals, noncompliance remedies, and award termination as between the agency and its grantee. None regulate a State, displace state law, or express a congressional purpose the Initiative frustrates. The Initiative requires nothing federal law forbids and forbids nothing it requires. (Plaintiffs' "scope of project" footnote, Pls.' Opp'n 17 n.7, fails for the same reason: 42 U.S.C. § 254b(e)(5)(D) defines what a federal award may support, not a ceiling on State authority.)

### d.    Section 1396a(bb) Governs What the State Pays, Not How a Clinic Spends What It Receives.

Plaintiffs' Medicaid theory rests on a category error. Section 1396a(bb) is a payment command: it directs how the State must reimburse an FQHC for covered services—"payment . . . (calculated on a per visit basis) . . . equal to 100 percent of the [reasonable and related] costs," adjusted annually. 42 U.S.C. § 1396a(bb)(1)-(3). It says nothing about what a clinic must do with a dollar once the State has paid it. The Initiative operates only on that second dimension: it does not alter the prospective payment system, recompute the per-visit rate, or reduce any reimbursement. Plaintiffs do not contend otherwise. They argue only that because the ratio is "measured against total revenue"—which includes Medicaid reimbursements—the measure will "necessarily direct" some of

those dollars to the State. *See* Pls.' Opp'n 20.[1] Even if true, a law regulating how an entity deploys money already paid to it is not a reimbursement methodology, and does not become one because the entity's revenue includes federal-program payments. Provider taxes, minimum-wage laws, and licensure fees all reach dollars a clinic received as Medicaid reimbursement; none is a "clawback" because none reduces, conditions, or recaptures the payment § 1396a(bb) protects. In any event, the premise is false: the Initiative's text gives clinics multiple ways to comply without paying the State any penalties, penalties are refundable on compliance, and even unreimbursed penalties fund clinic-workforce programs rather than the general fund.

Plaintiffs' authorities do not bridge the gap because none of them reaches a clinic's use of the funds it has already received. Two are rate cases: each concerned a state methodology that operated directly on the per-visit payment. In *Chase Brexton*, Maryland's "cap and ceiling" system reduced the reimbursement rate below 100 percent of reasonable cost, and the court struck it on APA arbitrary-and-capricious grounds while expressly rejecting the FQHCs' preemption argument. *Chase Brexton Health Servs., Inc. v. Maryland Dep't of Health & Mental Hygiene*, No. MJG-03-1548, 2006 WL 6593814, at *2, *5 (D. Md. Dec. 15, 2006). *Wilson-Coker* concerned Connecticut's productivity screen, which likewise reduced the per-visit payment and turned entirely on *Chevron* deference to CMS that *Loper Bright* has since abrogated. *Cmty. Health Ctr., Inc. v. Wilson-Coker*, 311 F.3d 132, 134-35, 137-40 (2d Cir. 2002); *Loper Bright Enters. v. Raimondo*, 603 U.S. 369, 412-13 (2024). The third is not a spending case at all: *California Association of Rural Health Clinics v. Douglas* holds only that a State may not eliminate coverage for mandatory services—a limit on what services a State must reimburse, not what a clinic does with revenue already paid. 738 F.3d 1007, 1014-17 (9th Cir. 2013). Each addresses the payment § 1396a(bb) guarantees; none address a generally applicable regulation of how a clinic deploys that payment once received.

---

[1] Plaintiffs distort Proponent Defendants' opening brief, which said the ratio would direct dollars to "program services." Proponents' Mot. 24:10-11. Plaintiffs attempt to render this an admission that dollars flow "back to the State." *See* Pls.' Opp'n 20:22-25. Proponent Defendants make no such admission. Indeed, the Initiative offers multiple paths to compliance, refunds penalties to non-compliant clinics that come into compliance, and directs even unreimbursed penalties to clinic workforce initiatives rather than the general fund. Init. § 4 (proposed Cal. Health & Safety Code § 1234.1(a)(2)-(3)). This distortion is of a piece with Plaintiffs' omission of the Initiative's successor clause, discussed in Section II.A.2.a above.

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS

Finally, the theory cannot support facial relief. Even accepting that a Medicaid-heavy clinic may redirect some Medicaid dollars, on Plaintiffs' own allegations, 37% of covered-clinic revenue comes from other sources. *See* Compl. ¶ 109. And that figure is an industry-wide average. Individual clinics presumably vary, some with higher non-Medicaid shares. A theory keyed to redirected Medicaid reimbursement thus cannot show the measure invalid in *every* application, as *Salerno* requires—indeed it could not be applied at all to a substantially non-Medicaid clinic.

### e.    The General Appropriations Law (31 U.S.C. § 1301) Supplies No Command the Initiative Transgresses.

Plaintiffs argue their appropriations claim "turns on whether a state law 'stand[s] as an obstacle to . . . the full purposes and objectives of Congress' . . . not on how the State labels or computes its exaction," Pls.' Opp'n 20—which essentially restates the obstacle theory refuted in the Section 330 discussion. Section 1301(a) itself is a rule of federal fiscal discipline, directing that "[a]ppropriations shall be applied only to the objects for which [they] . . . were made," enforced through agency disallowance and the Antideficiency Act, 31 U.S.C. § 1341—not through the Supremacy Clause. It announces no command to the States in their regulatory capacity, and Plaintiffs identify no decision deploying it to preempt a generally applicable state law. Plaintiffs' own authorities are not to the contrary; each policed the misdirection of a specific, identified federal appropriation, *see Shepheard v. Godwin*, 280 F. Supp. 869, 873-74 (E.D. Va. 1968); *Carlsbad Union Sch. Dist. v. Rafferty*, 300 F. Supp. 434, 439-40 (S.D. Cal. 1969); *Pa. Dep't of Pub. Welfare v. Sebelius*, 674 F.3d 139, 154-55 (3d Cir. 2012), whereas the Mission Spend Ratio is keyed to a clinic's total revenue, reduces no federal payment, and traces no appropriated dollar. The appropriations theory identifies no federal command the Initiative transgresses.

### III.    CONCLUSION

In sum, the Court should grant the Proponent Defendants' motion to dismiss under Rules 12(b)(1) and 12(b)(6), and dismiss the complaint in its entirety.[2]

---

[2] The CHA and CMA amicus briefs warrant no response. They raise policy objections to the Initiative. These are arguments for the electorate, not this Court. They do not bear on any of the questions presented: standing, ripeness, the existence of a cause of action, or facial preemption.

DATED: July 10, 2026          By:    /s/ Darin Ranahan
Catha Worthman
Darin Ranahan
FEINBERG, JACKSON, WORTHMAN
& WASOW LLP
2030 Addison Street, Suite 500
Berkeley, California 94704
Telephone: (510) 269-7998

Bruce Harland, SBN 230477
WEINBERG ROGER & ROSENFELD
1375 55th Street
Emeryville, CA 94608
(510) 337-1001
bharland@unioncounsel.net

Stephen Kaufman, SBN 131605
Gary Winuk, SBN 190313
George Yin, SBN 213910
KAUFMAN LEGAL GROUP, APC
445 S. Figueroa Street
Suite 2400
Los Angeles, CA 90071
(213) 452-6566
skaufman@kaufmanlegalgroup.com
gwinuk@kaufmanlegalgroup.com
gyin@kaufmanlegalgroup.com

***Attorneys for Defendants Service Employees
International Union – United Healthcare Workers
West, Shawna Brown, Sean Fleming***

REPLY IN SUPPORT OF PROPONENT DEFENDANTS' MOTION TO DISMISS